USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1954 UNITED STATES, Appellee, v. NICHOLAS LIMBEROPOULOS, Defendant, Appellant. __________ No. 92-1955 UNITED STATES, Appellee, v. WILLIAM LIMBEROPOULOS, Defendant, Appellant. __________ No. 92-2075 UNITED STATES, Appellant, v. NICHOLAS LIMBEROPOULOS, Defendant, Appellee. __________ No. 92-2076 UNITED STATES, Appellant, v. WILLIAM LIMBEROPOULOS, Defendant, Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Breyer,* Chief Judge, ___________ Selya and Boudin, Circuit Judges. ______________ ____________________ Steven J. Rappaport with whom Rappaport, Freeman & Pinta was on ____________________ ____________________________ briefs for Nicholas Limberopoulos. Barry P. Wilson with whom Craig A. Cellitti was on briefs for ________________ __________________ William Limberopoulos. Michael Kendall, Assistant United States Attorney, and Frank A. _______________ _________ Libby, Jr., Assistant United States Attorney, with whom A. John __________ ________ Pappalardo, United States Attorney, was on briefs for United States of __________ America. ____________________ June 14, 1994 ____________________ ____________________ *Chief Judge Stephen Breyer heard oral argument in this matter and participated in the drafting of the opinion, but did not participate in issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. 46(d). 2 SELYA, Circuit Judge. A jury convicted Nicholas and ______________ William Limberopoulos, both pharmacists, of conspiring to dispense, without proper prescriptions, approximately 18,000 pills, about 12,000 of which were Percodan or Percocet and about 4,000 of which were Valium. See 21 U.S.C. 841(a)(1) ___ (distributing or dispensing addictive drugs); 21 U.S.C. 843(a)(2) (false DEA numbers); 21 U.S.C. 843(a)(4)(A) (false prescriptions); 21 U.S.C. 846 (conspiracy). At sentencing, the district court departed from the specified guideline sentencing ranges (GSRs) 235-293 months for Nicholas and 188-235 months for his son, William and instead sentenced Nicholas to 36 months in prison and William to 30 months in prison. The court departed because, in its view, the defendants' conduct fell outside the "heartland" of the unlawful-drug-trafficking statute, 21 U.S.C. 841, but within the "heartland" of an unlawful-drug- prescribing statute, 21 U.S.C. 843. Since this latter statute, which is regulatory in nature, limits prison terms to a 48-month maximum, far less than the maximum under section 841, the court felt justified in departing downward. Both sides appeal. We agree with the government that the district court's "heartland" determinations rest upon an erroneous conception of the unlawful-drug-prescribing statute. We do not accept the defendants' arguments on this, or on any other issue. Consequently, we affirm the defendants' convictions and remand the case for resentencing. We specify that, even though we find the court's given ground for departure legally 3 inadequate, the court remains free to consider departure if other, legally adequate reasons exist. I Background __________ A. The Trial _________ As is well known, the unlawful-drug-trafficking statute, 21 U.S.C. 841, forbids, among other things, the distribution, dispensing, or possession with intent to distribute of highly addictive "Schedule II" drugs. Other less well-known statutes apply to pharmacists, requiring that they maintain inventory records, dispense drugs only in pursuance of proper prescriptions, and keep copies of all such prescriptions, duly canceled to prevent unauthorized reuse. See 21 U.S.C. 827- ___ 830. What we have called the unlawful-drug-prescribing statute, 21 U.S.C. 843, makes it a crime, among other things, to violate certain of these record-keeping requirements. In this case, the government charged the defendants both with violating the unlawful-drug-prescribing statute, 21 U.S.C. 843, and with conspiring to violate the unlawful-drug- trafficking statute, 21 U.S.C. 841. It introduced evidence that, in essence, showed the following: 1. In 1988 and again in 1989, Drug Enforcement Administration (DEA) agents found that Limby's Pharmacy in Lowell, Massachusetts had not kept inventory records of its addictive drugs. The agents seized a group of Limby's canceled prescriptions (written between 1986 and 1988) and concluded that they were fraudulent. 4 2. Seven physicians testified that they had not signed their names to particular prescriptions, as the pharmacy's records indicated. Some of these witnesses pointed out that the prescriptions bore signatures or customer names that seemed not only false, but obviously so, as, for example, the customer name "Tin Can" on a prescription form falsely bearing the name of a Vietnamese physician. An eighth doctor had died before the time of the purported issuance of prescriptions bearing his name. Five of the "recipients" listed on the prescriptions, according to their own testimony or that of their relatives, had not requested, or received, the drugs purportedly prescribed. 3. A drug addict testified that he had often bought addictive drugs at Limby's, without prescription, between 1986 and 1987. He added that Limby's clerk, from whom he bought the drugs, told him not to worry about the fact that Nicholas Limberopoulos knew that the clerk was selling him addictive drugs. On the basis of this, and related, evidence, the jury convicted Nicholas Limberopoulos, who owned Limby's Pharmacy and worked there occasionally, of writing 13 false prescriptions.1 See 21 ___ U.S.C. 843(a)(4)(A). It convicted his son, William, who worked at Limby's regularly, of writing 39 other false prescriptions. See id. It convicted William, but acquitted Nicholas, of using ___ __ false DEA numbers. See 21 U.S.C. 843(a)(2). And it convicted ___ both defendants of conspiring to distribute addictive drugs to others. See 21 U.S.C. 841, 846. ___ B Sentencing __________ At sentencing, the district court first calculated the GSRs, properly using the June 15, 1988 version of the guidelines ____________________ 1One of the counts of conviction has since been dismissed on motion of the government. 5 (to which we shall refer throughout). The court referred to the guideline applicable to a conspiracy to dispense Schedule II drugs unlawfully, see U.S.S.G. 2D1.4 & App. A-19, as that ___ guideline instructs, found the weight of the various pills involved, and converted these weights into an equivalent weight in heroin. The court did so by aggregating the weight of all the pills listed on the false prescriptions underlying the substantive counts on which either Nicholas or William had been convicted (as well as a few other pills listed on a small group of related prescriptions). See U.S.S.G. 1B1.3(a)(2) & comment. ___ (2). For example, the jury found Nicholas responsible for 13 false prescriptions, which, taken together, accounted for the dispensing of 275 grams of Percocet and 392.7 grams of Valium. The jury found William responsible for 92 violations concerning false prescriptions and DEA numbers, which, taken together, involved 2145 grams of Percocet, 1720 grams of Percodan, and 50.5 grams of Valium. The guidelines specified that these amounts (plus the weight of the few additional related pills) should be treated as the equivalent of between 3 and 9.9 kilograms of heroin, yielding a base offense level of 34. The court added two more levels for each defendant's "abuse of a position of trust," U.S.S.G. 3B1.3, and it added two further levels for Nicholas's "obstruction of justice." Id. 3C1.1. The result level 38 __ for Nicholas and level 36 for William produced GSRs for these two first-time offenders of 235-293 months for Nicholas and 188- 235 months for William. 6 The lower court then departed downward from the GSRs because it believed that the defendants' conduct amounted, not to unlawful drug trafficking, but, rather, to the kind of "regulatory" offense forbidden by the unlawful-drug-prescribing statute, with its maximum penalty of 48 months in prison. The court wrote: [I]t is the case here that the object of the conspiracy charged, the charged part of the conspiracy, is dispensing drugs pursuant to prescriptions not issued for [a] legitimate medical purpose. That is also the essence of the substantive offenses charged. Under these circumstances, the mechanical application of [the] guidelines with respect to count 1 [drug trafficking] significantly, significantly, overstates the seriousness of the predicate and substantive offenses. This case is not a typical drug conspiracy case. Indeed, all of the substantive offenses are violations of a regulatory statute [21 U.S.C. 843], and Congress's intent with respect thereto was, in this case, overridden by the use of sections 846 [the conspiracy statute] and 841 [the drug trafficking statute] . . . . Accordingly, I shall depart for the reasons I have just mentioned. This said, the court imposed a 36-month prison term on Nicholas and a 30-month prison term on William. The government and the defendants now cross-appeal. II The Government's Appeal _______________________ The government appeals the court's decision to depart downward. It acknowledges that the district court has broad power to depart from a properly calculated sentencing range in an unusual case a case that lies outside the "heartland" of the 7 base guideline that would otherwise apply. See United States v. ___ _____________ Rivera, 994 F.2d 942, 947 (1st Cir. 1993); United States v. Diaz- ______ _____________ _____ Villafane, 874 F.2d 43, 49 (1st Cir.), cert. denied, 493 U.S. 862 _________ ____________ (1989); see also U.S.S.G. Ch. I, Pt. A, intro. comment. 4(b). ___ ____ But the sentencing court must give its reason(s) for departing, see 18 U.S.C. 3553(c)(2); and the government asks this court to ___ review the legal adequacy of those reasons, as well as the reasonableness of the result. See Rivera, 994 F.2d at 950-52; ___ ______ Diaz-Villafane, 874 F.2d at 50; see also 18 U.S.C. 3742(e)(3). ______________ ___ ____ In particular, the government urges us to find that the district court's reason for departing reflects a misunderstanding of the basic aim that animates the unlawful-drug-prescribing statute. The district court's reason for departing here is its professed belief that defendants' conduct fell outside the "heartland" of the strict unlawful-drug-trafficking statute, 21 U.S.C. 841, but within the "heartland" of the more lenient unlawful-drug-prescribing statute, 21 U.S.C. 843. That is to say, the court thought that the offenders' conduct, while technically falling within a specific statute and guideline, in reality more closely resembled conduct forbidden by a different statute and guideline (as, for example, a technical tax law conviction might involve conduct more appropriately described as "insider trading"). And, for that reason, it concluded that departure was appropriate. The district court misunderstood the relationship between the two relevant statutes the unlawful-drug-trafficking 8 statute, section 841, and the unlawful-drug-prescribing statute, section 843 and therefore, misapplied its theory of departure here. The court seemed to think that the former statute primarily targets non-pharmacists (those, say, who sell illegal drugs on the street), while the latter primarily targets pharmacists selling drugs unlawfully without prescriptions in their shops. For that reason, it felt that the defendants' conduct more appropriately fell within the "heartland" of section 843, not section 841. Our examination of the history and use of the two statutes, however, indicates that they basically make a different distinction a distinction between unlawful drug distribution on one hand, and unlawful record-keeping on the other hand. Here, moreover, the defendants' conduct seems to involve the former considerably more than the latter. We begin the process of adding flesh to this barebones legal conclusion about the interrelationship of the two statutes by remarking the obvious: the unlawful-drug-trafficking statute, 21 U.S.C. 841, does not exempt pharmacists who sell narcotic drugs without prescriptions, nor does it suggest that their conduct is somehow less seriously wrong than the conduct of non- pharmacist drug dealers. On the contrary, the statute applies to the two groups' conduct in the same way. The statute's language simply makes it a crime "knowingly or intentionally" to "distribute or dispense" narcotic drugs. And this language is reinforced by well-established case law making clear that the statute applies to a pharmacist's (or physician's) drug- 9 dispensing activities so long as they fall outside the usual course of professional practice. See United States v. Moore, 423 ___ _____________ _____ U.S. 122, 142 (1975); United States v. DeBoer, 966 F.2d 1066, ______________ ______ 1068-69 (6th Cir. 1992); United States v. Hughes, 895 F.2d 1135, _____________ ______ 1143 (6th Cir. 1990); United States v. Vamos, 797 F.2d 1146, 1152 _____________ _____ (2d Cir. 1986), cert. denied, 479 U.S. 1036 (1987); United States ____________ _____________ v. Norris, 780 F.2d 1207, 1209 (5th Cir. 1986); United States v. ______ _____________ Lawson, 682 F.2d 480, 482 (4th Cir.), cert. denied, 459 U.S. 991 ______ ____________ (1982); United States v. Hayes, 595 F.2d 258, 260 (5th Cir.), _____________ _____ cert. denied, 444 U.S. 866 (1979); United States v. Kirk, 584 ____________ _____________ ____ F.2d 773, 784 (6th Cir.), cert. denied, 439 U.S. 1048 (1978); see ____________ ___ also 21 C.F.R. 1306.04(a) (explicitly subjecting a pharmacist ____ to the penalties of section 841 if he knowingly fills a prescription "not issued in the usual course of professional treatment"); cf. 21 U.S.C. 822(b) (exempting pharmacists from ___ section 841 but only "to the extent authorized by their registration"). This standard might mean that a drug-dispensing pharmacist does not violate section 841 if he believes that a customer (even a customer who lacks a valid prescription) needs the drugs for legitimate medical treatment. Cf. Moore, 423 U.S. __ _____ at 138-39 (implicitly approving a jury instruction explaining that a physician could be convicted if he knowingly distributed controlled drugs "other than in good faith . . . in the usual course of a professional practice"); United States v. Seelig, 622 _____________ ______ F.2d 207, 213 (6th Cir.) (stating that section 841(a)(1) requires 10 proof beyond a reasonable doubt "that the drugs were distributed outside the usual course of professional practice"), cert. _____ denied, 449 U.S. 869 (1980). It is certainly arguable that, at ______ the very least, that kind of "good faith" case would skirt section 841's heartland. But if the drug-dispensing pharmacist knows that a customer not only lacks a valid prescription but also will not use the drugs for legitimate medical purposes, then section 841 applies in full flower and treats the dispenser like a pusher. See Moore, 423 U.S. at 142-43. Indeed, it is ___ _____ difficult to find a relevant difference between a pharmacist who, without proper prescriptions, knowingly supplies a drug addict or trafficker with narcotics, and any other drug dealer who does the same. Another line of reasoning leads to the same conclusion. The unlawful-drug-prescribing statute, 21 U.S.C. 843, is aimed for the most part at a pharmacist's knowing failure to use and maintain proper prescription forms, registration numbers, and kindred records. Such a failure might, or might not, come accompanied with the pharmacist's knowing sale of narcotics to addicts or traffickers. The pharmacist, for example, simply might have failed to report his drug supply properly, see, e.g., ___ ____ United States v. Sterber, 846 F.2d 842 (2d Cir. 1988); or he _____________ _______ might have acquired the narcotics improperly, see, e.g., United ___ ____ ______ States v. Pastor, 557 F.2d 930 (2d Cir. 1977); or, he might have ______ ______ used an expired DEA registration number in filling a prescription for a customer whom he believed legitimately needed the drugs for 11 medicinal purposes, see, e.g., United States v. Carranza, 632 F. ___ ____ _____________ ________ Supp. 1030 (S.D.N.Y. 1986). The provision's legislative history indicates that Congress intended it chiefly to address a threat to the integrity of the regulatory system, i.e., the system for __________ ____ administrative control of the legitimate drug industry. See 116 ___ Cong. Rec. 996-98 (1970) (statements of Sen. Dodd and Sen. Griffin); see also Moore, 423 U.S. at 135. The statute's ___ ____ _____ comparatively low maximum penalty provision suggests the same. Compare 21 U.S.C. 843(c) (48-month maximum) with id. 841(b) _______ ____ __ (life imprisonment maximum). Our search of the case law confirms the regulatory thrust of section 843. Close perscrutation reveals that the government has used section 843, in separate prosecutions, where regulatory, not drug-trafficking, problems are at issue. See, ___ e.g., Sterber, 846 F.2d at 842; United States v. Cantor, Crim. ____ _______ ______ ______ ______ No. 91-00021, 1991 WL 161017 (E.D. Pa. Aug. 14, 1991); Carranza, ________ 632 F. Supp. at 1031. The fact that the government sometimes charges violations of both sections 841 and 843 in drug- trafficking cases, see, e.g., Vamos, 797 F.2d at 1148; United ___ ____ _____ ______ States v. Devous, 764 F.2d 1349, 1351 (10th Cir. 1985); United ______ ______ ______ States v. Goldfine, 538 F.2d 815,817 (9th Cir. 1976), does not ______ ________ show the contrary, for in such instances, if the same conduct is involved, section 843 would be a lesser included offense. In the case before us, the government claimed that the defendants systematically and knowingly sold narcotic drugs, without proper prescriptions, to drug addicts and drug dealers 12 whom they knew had no legitimate medical need for the drugs. The court instructed the jury that it could acquit the defendants if it found that they had acted in "good faith," but the jury declined to do so; it thereby accepted the government's claims that the defendants acted with knowledge and evil intent. For this reason, one cannot easily characterize their conduct as involving, simply or only, the kind of record-keeping violations at which section 843 seems basically aimed, and which appear to provide the rationale for its 48-month ceiling on imprisonment. Thus, the district court's view that the defendants' conduct fell within the "heartland" of section 843, but not of section 841, reflects a misunderstanding of the basic objectives of the two statutes and their interplay.2 That being so, we must set aside the defendants' sentences and return the case for resentencing. ____________________ 2Our determination that the defendants' conduct, as charged and proven, fell within the "heartland" of section 841 bears a strong analytical resemblance to our recent decision in United States v. _____________ LeBlanc, ___ F.3d ___, (1st Cir. 1994) [No. 93-1998]. There, the _______ district court, confronted with bookmakers who had laundered gambling proceeds and who stood convicted of violating, inter _____ alia, 18 U.S.C. 1956-1957 (proscribing "structuring" of ____ certain monetary transactions), departed downward to make the sentences commensurate with the relatively modest GSR that customarily characterized gambling offenses (rather than the relatively steep GSR that customarily characterized money laundering offenses). The court premised the departure on the ground that the money laundering offenses "stem[med] from the prior specified unlawful activity of operating an illegal gambling business," and, therefore, fell "outside . . . the 'heartland' of the money laundering guidelines." Id. at ___ ___ [slip op. at 11]. We reversed, holding that, since the proscribed conduct "not only comes within the plain meaning of [the anti-structuring statute], but also was within the full contemplation of Congress when it enacted that statute," id. at ___ ___ [slip op. at 15], the court's stated ground of departure could not be upheld, id. at 16-17. So it is here. ___ 13 See Rivera, 994 F.2d at 951 (explaining that an appellate court ___ ______ will review a purely legal determination without deference to the district court). Counsel for the defendants have argued that there are several other special features of this case that make departure appropriate. We express no view about whether that is, or is not, so. Departure decisions are for the sentencing court in the first instance. On remand, the district court remains free to consider departure for other reasons. See id. at 956. ___ ___ III Nicholas Limberopoulos's Appeal _______________________________ In Nicholas Limberopoulos's appeal, he claims primarily that the district court did not correctly calculate the GSR (from which it then departed). We find no legal error in the challenged calculations. 1. The Number of Pills. The guideline applicable to ____________________ drug trafficking conspiracies3 relates base offense levels to the amount of "heroin-equivalent" drug involved in the conspiracy. See U.S.S.G. 2D1.1 (Drug Quantity Table). The ___ amount of heroin-equivalent drug depends upon the total weight of the Percodan, Percocet, and other pills, which is then converted into heroin equivalents. See, id., comment. (n.10) (Drug ___ ___ ____________________ 3Technically, there are two statutes involved in the count of conviction here. 21 U.S.C. 846 outlaws conspiracies to violate drug trafficking laws, while 21 U.S.C. 841 is the particular drug trafficking law that these defendants allegedly conspired to violate. For ease in reference, we shall refer to the conspiracy as a "section 841 conspiracy." 14 Equivalency Table). Recognizing that, in this instance, the total weight of the pills depends upon the total number of pills for which each defendant is responsible, Nicholas Limberopoulos argues that the district court wrongly attributed to him pills for which William, not he, should have been held accountable. He rests this conclusion on the premise that the jury might have thought that he was involved in a conspiracy not with William, but with others; and that, if the jury did think so, it would also have thought that William's pills had nothing to do with the conspiracy underbracing Nicholas's conviction. The problem with this thesis is that the guidelines normally leave to the sentencing judge, not the jury, the determination of the "conduct" that is "relevant" to sentencing. See U.S.S.G. 6A1.3. Nothing the jury decided prevented the ___ judge from finding a conspiracy between Nicholas and William. Furthermore, the evidence to support a finding of such a conspiracy, whether by judge or jury, is ample. The evidence showed, for example, that Nicholas owned Limby's Pharmacy. He worked there on weekends and some weekdays. William, his son, worked there most weekdays and occasionally on weekends. The only other employee involved in drug-dispensing was a clerk. The unlawful sales involved a large number of pills and took place at frequent intervals over a period of two years. The clerk told a drug-addict customer (who had obvious physical symptoms of drug withdrawal) that it did not matter if Nicholas knew that the clerk was selling drugs to the addict without a 15 proper prescription. From this evidence the court (and the jury, too) might reasonably have concluded that Nicholas and William each knew the other was dispensing drugs unlawfully, and that each agreed to help the other do so through the ownership and operation of the pharmacy, the maintenance of false records, and the like. Such an implicit agreement amounts to a conspiracy. See, e.g., Direct Sales Co. v. United States, 319 U.S. 703, 714 ___ ____ ________________ _____________ (1943). The court, therefore, could reasonably attribute to Nicholas the pills that William sold, having found them to be "part of the same . . . common scheme or plan." U.S.S.G. 1B1.3(a)(2). By like token, the court could attribute to Nicholas pills that William improperly dispensed prior to February 10, 1987 (the earliest date of a prescription that Nicholas canceled). 2. The Weight. Nicholas also argues that the court __________ erred in calculating drug weight by, in effect, weighing the entire pill, and, thus, counting the weight of both narcotic and nonnarcotic ingredients (increasing the weight, say, of a single Percocet pill from roughly five one-thousandths to five-tenths of a gram). In doing so, however, the court simply followed the instructions of the Sentencing Commission, which tells judges that the scale amounts for all controlled substances refer to the total weight of the controlled substance. Consistent with the provisions of the Anti-Drug Abuse Act, if any mixture of a compound contains any detectable amount of a controlled substance, the entire amount of the mixture or compound shall be considered in measuring the quantity. 16 U.S.S.G. 2D1.1 (Drug Quantity Table, n.*). All seven circuits that have considered the matter have held that this language (or the language of a substantially similar amended version of the note, see id. (Nov. 1989)), means ___ __ what it says, namely, that the sentencing court must include the weight of an entire pharmaceutical pill and not just the weight of the active narcotic ingredients. See United States v. ___ ______________ Crowell, 9 F.3d 1452, 1454 (9th Cir. 1993); United States v. _______ ______________ Young, 992 F.2d 207, 209 (8th Cir. 1993); United States v. _____ ______________ Blythe, 944 F.2d 356, 362 (7th Cir. 1991); United States v. ______ ______________ Shabazz, 933 F.2d 1029, 1032-33 (D.C. Cir.), cert. denied, 112 S. _______ ____________ Ct. 431 (1991); United States v. Lazarchik, 924 F.2d 211, 214 _____________ _________ (11th Cir.), cert. denied, 112 S. Ct. 96 (1991); United States v. ____________ _____________ Meitinger, 901 F.2d 27, 29 (4th Cir.), cert. denied, 498 U.S. 985 _________ ____________ (1990); United States v. Bayerle, 898 F.2d 28, 31 (4th Cir. ______________ _______ 1989), cert. denied, 498 U.S. 819 (1990); United States v. _____________ _____________ Gurgiolo, 894 F.2d 56, 61 (3d Cir. 1990). We agree with this ________ authority. The defendants sing one esoteric tune which, they tell us, the other courts did not fully consider. They point out that the instruction we have quoted prefaces its statement with the words "[c]onsistent with the provisions of the Anti-Drug Abuse Act." They then assert that that Act specifies weighing the "entire mixture or compound" for street drugs, such as heroin, ______ but says nothing about pharmaceutical drugs. The defendants add ______________ that the rationale the Supreme Court has identified as underlying 17 the use of gross, as opposed to net, weights namely, maintaining serious punishment for street pushers of diluted mixtures, see Chapman v. United States, 111 S. Ct. 1919, 1927 ___ _______ ______________ (1991) does not make sense, and, hence, should not apply, when pharmaceutical drugs are at issue. The chief problem with this construct is that it does not show an inconsistency between the Act and the Sentencing Commission's instruction. The Act does not forbid use of gross pharmaceutical drug weights as a way to measure just how many pills, say of Percodan, warrant the same punishment as a given amount of heroin. Nor have defendants convinced us that it is irrational to tie these punishment equivalencies to gross pill weight, rather than applying some mechanical operation to net weight (say, multiplying active ingredient weight by 100) and thereby reaching approximately the same punishment results.4 Nor, finally, is it clear to us what the use of gross weight for purposes of conversion has to do with the existence, or nonexistence, of street pushers of pharmaceutical drugs. IV William Limberopoulos's Appeal ______________________________ William's appeal repeats various of Nicholas's arguments, which we reject for reasons previously stated. William also makes two fresh arguments. First, he points to Bruton v. United States, 391 U.S. 123 (1968), a case in which the ______ _____________ ____________________ 4Other circuits have found this approach to be rational and, consequently, have rejected similar importunings. See, e.g., ___ ____ Crowell, 9 F.3d at 1454; Shabazz, 933 F.2d at 1036-37. _______ _______ 18 Court held that admission of incriminating statements made out- of-court by a nontestifying codefendant (unavailable for cross- examination) entitled the defendant to a new, and separate, trial. He then claims that three such pieces of evidence were admitted against him here, namely, (1) portions of Nicholas's grand jury testimony, (2) a false exculpatory statement made by Nicholas to his attorney, and (3) Nicholas's action in giving up Limby's DEA license, which in William's view amounted to an admission of guilt. It is unclear whether William objected to this evidence at the time of its admission (though he did move for a severance with regard to the grand jury testimony before trial). We have nonetheless reviewed the record before us to determine whether this evidence is of the sort to which Bruton applies, that is, ______ evidence that has the "'powerfully incriminating' effect of one accomplice pointing the finger directly at another, without subjecting himself to cross-examination." United States v. ______________ DiGregorio, 605 F.2d 1184, 1190 (1st Cir.) (quoting Bruton, 391 __________ ______ U.S. at 135), cert. denied, 444 U.S. 937 (1979); see also United ____________ ___ ____ ______ States v. Nason, 9 F.3d 155, 160 (1st Cir. 1993), cert. denied, ______ _____ ____________ 114 S. Ct. 1331 (1994); United States v. Barnett, 989 F.2d 546, ______________ _______ 558 (1st Cir.), cert. denied, 114 S. Ct. 148 (1993). We conclude ____________ that it is not. The grand jury testimony that the government read at trial does not implicate William. The remaining portions of that testimony suggest that some of the false prescriptions may have ___ 19 been in William's handwriting, but they add little to other evidence on this point. Similarly, Nicholas's exculpatory statements to his lawyer and his surrender of Limby's license do not directly show William's guilt. Rather, their relevance in this respect requires a considerable chain of subsidiary inferences (i.e., that the exculpatory statement was an obvious ____ attempt at deceit and coverup, or the surrender of the license a kind of confession, both showing Nicholas's consciousness of his own guilt, which knowledge, through association, implies William's guilt as well). Such out-of-court statements neither name nor impugn William directly, and thus cannot be supposed to have implanted in the jurors' minds the kinds of powerfully incriminating impressions against which Bruton protects. See ______ ___ Richardson v. Marsh, 481 U.S. 200, 208-11 (1986) (explaining that __________ _____ Bruton applies to evidence incriminating on its face, not to ______ inferential incrimination, which can be cured by limiting instructions); cf. DiGregorio, 605 F.2d at 1190 (ruling the __ __________ unadorned fact that a codefendant's out-of-court admission tended to corroborate the government's case against the defendant to be insufficient to trigger Bruton). Again, in context, this out-of- ______ court evidence is weak, adding little, if anything, to the weight of the remaining evidence. Nor can we find anything else about the admission of this evidence that deprived William of a fair trial, "resulting in a miscarriage of justice." United States v. _____________ McLaughlin, 957 F.2d 12, 18 (1st Cir. 1992) (citation omitted). __________ Consequently, the law does not require relief on this ground. 20 Second, William complains that the sentencing court should have ordered a mental examination under 18 U.S.C. 3552(c). That provision, however, says that a district court "may" order a psychological examination of the defendant if it ___ "desires more information than is otherwise available to it as a basis for determining the mental condition of the defendant." Id. (emphasis supplied). In this case, the court was keenly ___ aware of William's psychological difficulties. The records he placed before the district judge showed a history of drug and alcohol abuse as well as personality disorders, such as narcissism. The judge could reasonably have concluded that the first set of matters was not directly related to the sentencing decision, see U.S.S.G. 5H1.4, p.s., while a mental examination ___ would add little or nothing of value to what it already knew about the second. In our view, the court did not exceed its discretionary authority to decide not to order the examination.5 V V Conclusion Conclusion __________ We need go no further. Though the combination comprises a bitter pill, defendants' convictions appear lawful, but their reduced sentences appear to have been inappropriately conceived. Consequently, for the reasons we have discussed, we affirm the convictions but vacate the defendants' sentences. We ____________________ 5We note, moreover, that William does not claim financial inability to arrange for such an examination at his own expense. Cf. 18 U.S.C. 3006A(e)(1) (instructing courts to appoint __ "investigative, expert, or other services" where such services are necessary and the defendant cannot otherwise afford them). 21 remand the matter to the district court for resentencing consistent with this opinion. So ordered. ___________ 22