UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

William O. STEELE, Defendant-Appellant, Cross-Appellee.

No. 94-3139.

United States Court of Appeals,

Eleventh Circuit.

June 25, 1999.

Appeals from the United States District Court for the Northern District of Florida. (No. 94-03055RV), Roger Vinson, Judge.

Before TJOFLAT and BIRCH, Circuit Judges, and SMITH[*], Senior Circuit Judge.

BIRCH, Circuit Judge:

William O. Steele appeals his conviction for dispensing controlled substances in violation of 21 U.S.C. § 841(a)(1), and the government cross-appeals the district court's application of the U.S. Sentencing Guidelines. Steele argues that his conviction must be vacated on three grounds: (1) the indictment was insufficient to allow him to prepare a defense and protect against double jeopardy; (2) the government improperly used its peremptory strikes based on gender; and (3) insufficient evidence existed to support his conviction. The government argues that the district court based its decision to depart downward from the sentence range on improper grounds. We affirm Steele's conviction but vacate Steele's sentence and remand for resentencing.

*I. Background*

Steele was a registered pharmacist at North Hill Pharmacy in Pensacola, Florida. During several months in 1993, Steele filled numerous prescriptions presented by Larry and Gloria Ellis for such drugs as Dilaudid, Xanax, Valium, and Percodan. The government alleged that Steele knew when dispensing these drugs that Larry Ellis had forged the prescriptions.

---

[*]Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

A four-count indictment charged Steele with knowingly dispensing controlled substances in violation of § 841(a)(1). Count One of the indictment stated:

> That from on or about July 1, 1993, and continuously thereafter, up to and including on or about November 2, 1993, in the Northern District of Florida, ... Steele, did knowingly and intentionally dispense hydromorphone hydrochloride, a schedule II controlled substance, commonly known as Dilaudid, in violation of Title 21, United States Code, Section 841(a)(1).

R1-1-1. Each of the remaining three counts contained identical language to Count One, except that the government substituted the three other controlled substances in the place of Dilaudid.

During the trial, the government's main witness was Larry Ellis, who testified pursuant to a plea agreement. Ellis testified that he informed Steele that he was a drug addict and had phony prescriptions that he hoped Steele would fill. According to Ellis, Steele agreed to fill the prescriptions and specified a system by which Ellis and his wife, Gloria, could fill the prescriptions. Ellis further testified that under the system he and Steele communicated almost daily about what drugs would be dispensed, what the prescriptions should say, and how they should be presented to the pharmacy. Gloria Ellis also testified pursuant to a plea agreement about the steps she took to fill the prescriptions, but she stated that she did not know whether Steele was involved in the scheme. Among other witnesses, the government called another pharmacist and a clerk from the North Hill Pharmacy, who both testified that they were suspicious about the prescriptions and informed Steele about their suspicions, but that Steele filled the prescriptions anyway.

The jury convicted Steele on all four counts. The sentencing court determined that Steele's sentence range under the Sentencing Guidelines was 151-188 months. Acting pursuant to section 5K2 of the Guidelines, the court ordered a downward departure in Steele's offense level by eight levels, resulting in a sentence range of 63-78 months. The court then sentenced Steele to 63 months of imprisonment.

Steele appealed, and a panel of this court reversed Steele's conviction. *See United States v. Steele,* 105 F.3d 603, 607 (11th Cir.1997) ("*Steele I* "), *superseded on reh'g,* 117 F.3d 1231 (1997) ("*Steele II* "). The panel reasoned that the government failed to charge in the indictment that Steele's conduct fell outside the statutory exception for dispensing controlled substances in the ordinary course of professional practice,

2

as was required by the then-existing law of this circuit as stated in *United States v. Outler,* 659 F.2d 1306, 1309 (5th Cir. Unit B 1981). *See Steele II,* 117 F.3d at 1234-35. Rehearing the case *en banc,* however, the court overruled *Outler* as inconsistent with the plain text of § 841(a)(1) and 21 U.S.C. § 885(a)(1), and held that the indictment was sufficient despite its omission of the statutory exception. *See United States v. Steele,* 147 F.3d 1316, 1320 (11th Cir.1998) (*en banc* ) ("*Steele III* "). The *en banc* court then remanded the case for a resolution of Steele's remaining claims, which we now address in this opinion.

### *II. Sufficiency of the Indictment*

Steele argues that, because the indictment does not specify the precise dates, locations, drug amounts, and purchasers for each time that he allegedly dispensed controlled substances, the indictment failed to permit him to prepare his defense as required by the Sixth Amendment, and failed to protect him against a second prosecution for the same offenses as required by the Fifth Amendment. Whether an indictment sufficiently alleges a statutorily proscribed offense is a question of law that we review *de novo. See United States v. Shotts,* 145 F.3d 1289, 1293 (11th Cir.1998), *cert. denied,* --- U.S. ----, 119 S.Ct. 1111, 143 L.Ed.2d 108 (1999).

An indictment is sufficient "if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *Steele III,* 147 F.3d at 1320 (quoting *United States v. Dabbs,* 134 F.3d 1071, 1079 (11th Cir.1998)). We concluded in *Steele III* that the indictment in this case satisfies these three conditions, which implicitly rejects Steele's present arguments regarding the omission of precise dates, locations, drug amounts, and purchasers. Nonetheless, because the *en banc* opinion expressly decided only the issue of whether the indictment needed to allege a statutory exception, we will comment briefly upon Steele's arguments that additional information must have been alleged in the indictment.

3

We begin by noting that, under the terms of the statute, time, location, drug amount, and purchaser are not essential elements of the offenses charged in this case.[1] It is true that "[i]f a general description of the offense is given then it is also necessary to allege facts and circumstances which will inform the defendant of the specific offense with which he is being charged." *Belt v. United States,* 868 F.2d 1208, 1211 (11th Cir.1989). When charging a defendant of participating in a conspiracy, the government may discharge its obligations by referring to a certain duration of time. *See Yonn,* 702 F.2d at 1348. For non-conspiracy offenses, the government ordinarily is able to specify an exact date of the alleged offense in the indictment, but the law is well settled that a failure to do so does not in all circumstances preclude a defendant from preparing an adequate defense or protecting against double jeopardy.

> Although it is unusual for an indictment not to pin down the date of the crime with greater specificity than this, it is nonetheless hornbook law that great generality in the allegation of date is allowed—at least where, as here, the exact time of the crime's commission is not important under the statute allegedly violated.

*United States v. Nunez,* 668 F.2d 10, 11-12 (1st Cir.1981) (internal citation and quotation marks omitted) (per curiam); *see also United States v. Perez,* 67 F.3d 1371, 1377 (9th Cir.1995) ("Furthermore, because time is not an element of the crime of distributing heroin, the indictment was not fatally broad for failing to include precise dates of distribution."), *withdrawn in part on other grounds,* 116 F.3d 840 (9th Cir.1997); *United States v. Jaswal,* 47 F.3d 539, 542-43 (2d Cir.1995) ("The failure to include the year in Count IV of the indictment is not fatally defective because the exact time when the defendants committed the crime in this case is immaterial.") (per curiam); *Butler v. United States,* 197 F.2d 561, 562 (10th Cir.1952) ("Where time

---

[1] This court has held that alleging that an offense occurred within a judicial district, such as the Northern District of Florida, is sufficient to describe the location of the offense. *See United States v. Yonn,* 702 F.2d 1341, 1348 (11th Cir.1983). In addition, courts hold that the amount of drugs involved in an offense is not an element of the offense but rather is a factor to be considered upon sentencing, and therefore need not be alleged in the indictment. *See United States v. Dorlouis,* 107 F.3d 248, 252 (4th Cir.), *cert. denied,* 521 U.S. 1126, 117 S.Ct. 2525, 138 L.Ed.2d 1025 (1997). We reject without further discussion Steele's argument that the indictment must specify the purchasers of the controlled substances, as no authority supports such a position. We therefore conclude that Steele's argument that an indictment alleging drug distribution must specify the locations, drug amounts, and purchasers is without merit, and we will focus our discussion in this opinion on the question of whether the indictment fails to specify with sufficient particularity the dates of the alleged offenses.

4

is not an essential element of the offense, it is sufficient to charge facts which show that the offense was committed within the statutory period of limitation and in such a case, even though there be a defect in the allegation as to time, it is one of form only.").

In this case, the government alleged that Steele illegally dispensed four specific controlled substances within a period of four months. Because Steele filled counterfeit prescriptions, he has records and receipts to which he can refer to identify the dates of the alleged offenses. Given these circumstances and the law summarized above, we conclude that, although we would have preferred that the government provide more precise dates in the four counts contained in this indictment, the failure to do so did not preclude Steele from adequately preparing his defense. We further conclude that the four-month period specified in the indictment does not expose Steele to double jeopardy concerns because "the court may refer to the entire record of the prior proceeding and [will] not be bound by the indictment alone." *See Jaswal,* 47 F.3d at 542-43 (internal quotation marks omitted). The indictment therefore complies with the Fifth and Sixth Amendments.

### III. Discriminatory Peremptory Challenges

Steele next argues that the government exercised its peremptory challenges during *voir dire* in a way that impermissibly discriminated against women. We give great deference to a district court's findings on the issue of discriminatory intent in the exercise of peremptory challenges, and we review its findings for clear error. *See United States v. Tokars,* 95 F.3d 1520, 1533 (11th Cir.1996), *cert. denied,* 520 U.S. 1132, 117 S.Ct. 1282, 137 L.Ed.2d 357 (1997).

The Supreme Court held in *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), that the use of peremptory challenges solely on the basis of the prospective juror's gender violates the Fourteenth Amendment. *Id.* at 129, 114 S.Ct. at 1421. In *Tokars,* we set forth the analytical framework to be applied to claims arising under *J.E.B.* 95 F.3d at 1533. First, the party challenging the peremptory strike must establish a prima facie case that the prosecutor exercised the peremptory strike for a discriminatory reason. *See id.* Second, if the party succeeds in establishing a prima facie case, the burden shifts to the

5

prosecutor to articulate a gender-neutral explanation for the strike. *See id.* Finally, the trial court "must ascertain whether the opponent of the strike has carried his or her burden of proving intentional discrimination." *Id.*

Here, Steele objected during *voir dire* to the fact that the government used all six of its peremptory challenges on women. We will assume for the purposes of this opinion that the government's use of strikes solely against women successfully established a prima facie case of discrimination; at any rate, the government does not argue that Steele failed to satisfy this obligation. After the district court inquired about the government's strikes, the prosecutor explained that she exercised the challenges because: (a) two of the prospective jurors were elementary school teachers, and the prosecutor was "leery" of school teachers; (b) three of the prospective jurors had worked in the medical industry, and the defendant was a pharmacist; and (c) one of the prospective jurors was a hair stylist, and the prosecutor feared that the juror would hear "gossip" about the case. *See* R6-92-96.

Steele argues that the government's reliance upon the two prospective jurors' jobs as schoolteachers is pretextual in light of the fact that the government did not strike a male project engineer at a junior college, a female school system clerk, and a female retired public school administrator. We disagree. The government rationally could believe that the accepted jurors held jobs that feature entirely different skills and responsibilities than that of an elementary school teacher. At any rate, "a legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection." *See Tokars,* 95 F.3d at 1533. Under the circumstances of this case, Steele has not shown that the prosecutor's decision to strike the school teachers was based upon their gender.

The same can be said of the prosecutor's decision to strike the hair stylist. Regardless of whether the prosecutor's concerns about an exposure to gossip at the workplace was reasonable, the record is devoid of evidence that suggests the decision was based on the juror's gender. As for the final three jurors struck by

6

the government, we find the prosecutor's reasons for striking those with medical backgrounds to be entirely reasonable, and no evidence suggests that male jurors with medical backgrounds were not stricken.

In sum, the common thread to Steele's argument is a lack of persuasive evidence suggesting that the prosecutor based her decisions to strike the six women even in part on their gender. In making this observation, we further note that the ultimate jury panel consisted of ten women and four men, and the unchallenged presence of protected class members on the final jury panel "undercuts [the] inference of impermissible discrimination that might arise solely from [the] striking of other ... prospective jurors." *United States v. Jiminez,* 983 F.2d 1020, 1024 n. 11 (11th Cir.1993) (considering a race-based challenge to the government's exercise of peremptory challenges). We therefore conclude that the district court did not clearly err in rejecting Steele's argument.

*IV. Sufficiency of the Evidence*

Steele next argues that the district court erred in rejecting his arguments that insufficient evidence existed to support his convictions. Steele argues that his convictions are based solely upon the testimony of government witnesses Larry and Gloria Ellis. According to Steele, the Ellis' testimony was so full of lies and manifest inconsistencies that no reasonable juror could believe Larry Ellis' story that Steele agreed to fill prescriptions that he knew Ellis had forged.

We review *de novo* the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. *United States v. Fischer,* 168 F.3d 1273, 1276 n. 7 (11th Cir.1999). We have held that, "[f]or testimony of a government witness to be incredible as a matter of law, it must be unbelievable on its face" and must relate to "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Calderon,* 127 F.3d 1314, 1325 (11th Cir.1997) (internal quotation marks and citation omitted), *cert. denied,* --- U.S. ----, 118 S.Ct. 1090, 140 L.Ed.2d 146 (1998). An argument that a witness was incredible as a matter of law is weakened when the

7

defendant cross-examined the witness concerning the alleged lies or inconsistencies and the judge instructed the jurors on the degree of suspicion they should hold when considering the witness' testimony, yet the jury chose to accept the witness' testimony. *See id.*

Here, the government indeed based its case against Steele primarily upon the testimony of Larry Ellis, an alleged co-conspirator whose testimony at times was inconsistent. Even so, the government adduced other evidence that corroborated Ellis' story that he and Steele entered an agreement to fill phony prescriptions. Another pharmacist who worked at North Hill Pharmacy testified that the prescriptions forged by Ellis were so suspicious that she refused to fill them. This pharmacist also testified that she conveyed these suspicions to Steele. A physician further corroborated the suspicious nature of the prescriptions by testifying that, based on the amount of pills contained in each prescription, the prescriptions were "extremely unusual." R8-223. Finally, the clerk at the North Hill Pharmacy testified that, after she questioned Steele about her suspicions regarding the prescriptions, Steele told her that Gloria Ellis, who brought the prescriptions into the pharmacy to be filled, was a nurse for the doctor listed on the phony prescriptions and that the prescriptions were for nursing home patients.

Steele overlooks this corroborating evidence and focuses instead on the lack of credibility that can be given to the testimony of Larry and Gloria Ellis. Steele's lawyer pointed out the inconsistencies in this testimony to the jury during crossexamination, and argued at length that the jury should discredit the testimony. The trial court instructed the jury concerning the skepticism with which they should consider some witnesses' testimony. The jury nonetheless rejected Steele's argument, and we find that the Ellis' testimony, when considered in light of the other evidence presented at trial, is not so inherently incredible that it cannot form the basis of a conviction under *Calderon.* For these reasons, we conclude that the district court properly rejected Steele's arguments based on the sufficiency of the evidence.

*V. Sentencing Issues*

8

The government's cross-appeal alleges that the district court erred in computing Steele's sentence under the Sentencing Guidelines. During the sentencing hearing, the district court found that the weight of the drugs for which Steele would be held accountable under the Sentencing Guidelines totaled an equivalent of 2,371.03 kilograms of marijuana.[2] In computing the total offense weight, the district court followed the rule set forth in *United States v. Lazarchik,* 924 F.2d 211 (11th Cir.1991), which provides that the court must use the total weight of the pills distributed by the defendant—that is, the weight of the drug contained in the pill as well as the weight of the substance in which the drug is mixed—rather than just the weight of the drug itself. *See* 924 F.2d at 214. After applying this rule, the district court calculated Steele's offense level as 34 with a sentence range of 151-188 months. The district court nonetheless noted that, if the weight of the substances with which the drugs were mixed to form the pills were excluded and the sentence based solely upon the net weight of drugs contained in the pills, the net weight would be the equivalent of approximately 89 kilograms of marijuana, giving Steele a total offense level of 26 and a sentence range of 63-78 months.

The district court thus concluded that, even though under *Lazarchik* Steele's total offense level was 34, the circumstances warranted a downward departure of eight offense levels pursuant to section 5K2 of the Sentencing Guidelines. This gave Steele a total offense level of 26 and a sentence level of 63-78 months, or the same sentence range that would have applied if the court used only the net weight of the drugs dispensed by Steele. The district court then sentenced Steele to 63 months of imprisonment. The court expressly noted that "a downward departure to the range which would have applied if the net weights were used is appropriate. That range more reasonably fits the actual crime and the 'good citizen' prior record of the defendant." R1-77-6. The government appeals this decision, arguing that the facts and circumstances of the case do not justify a downward departure under section 5K2.

---

[2] Pursuant to section 2D1.1 of the Sentencing Guidelines, the district court multiplied the weights of the prescription drugs dispensed by Steele by conversion factors to provide an "equivalent" weight of marijuana that was then used to determine Steele's sentence. *See* U.S. Sentencing Guidelines Manual § 2D1.1 application n. 10, at 89 (Nov.1993 ed.).

In reviewing the district court's application of the Sentencing Guidelines, we apply the version of the Guidelines in effect on the date of the sentencing hearing, *see United States v. Gunby,* 112 F.3d 1493, 1500 n. 9 (11th Cir.1997), which in this case is the November 1993 edition. Section 5K2 has been amended several times during the pendency of this appeal, but all the amendments have been deemed to be clarifications so we may apply the current language and case law in this appeal. *See id.* We review a district court's decision to depart downward pursuant to section 5K2 for abuse of discretion. *See Koon v. United States,* 518 U.S. 81, 99-100, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996).

Generally, a sentencing court must impose a sentence within the range provided for in the Sentencing Guidelines unless the court finds there exists a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." U.S. Sentencing Guidelines Manual § 5K2.0 (Nov.1998 ed.) (setting forth policy statement for departures under section 5K2). In *Koon,* the Supreme Court clarified the application of this section, holding that the unusual circumstances justifying a departure must take the case outside the "heartland" of cases contemplated by the applicable guidelines. *See* 518 U.S. at 94-96, 116 S.Ct. at 2045.

To aid in this review, this circuit adopted a rule that "a district court granting a downward departure must articulate the specific mitigating circumstances upon which it relies and the reasons why these circumstances take a case out of the guidelines' heartland." *United States v. Tomono,* 143 F.3d 1401, 1403 (11th Cir.1998) (per curiam). Once the court identifies these circumstances, three questions must be answered before deciding whether a departure is justified: (1) did the Sentencing Commission forbid departure based on the particular circumstances; (2) if not, did the Commission encourage departure based on the particular circumstances; and (3) if not, did the Commission discourage departure based on the particular circumstances? *See United States v. Willis,* 139 F.3d 811, 812 (11th Cir.1998) (per curiam). If the circumstance is not encouraged or discouraged by the Commission, "the court must, after considering the

10

structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland." *Koon,* 518 U.S. at 96, 116 S.Ct. at 2045 (internal quotations omitted). Moreover, the court "must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.' " *Id.* (citation omitted).

The district court departed downward pursuant to section 5K2 on five grounds: (a) Steele's conduct—dispensing prescription drugs that were legally in his possession by filling forged prescriptions that appeared to be otherwise valid—was not the target of § 841(a)(1), which was aimed more at street dealers who sell illegal narcotics; (b) Steele received additional punishment beyond his criminal sentence by losing his pharmacist's license; (c) the computation of the drug weights in this case created a disparity when compared to drugs that are not mixed with other compounds to form tablets or pills; (d) Steele made only a nominal profit from the drug sales in this case (approximately $700, or the price of eight ounces of marijuana), but was held accountable at sentencing for the equivalent of 5,227 pounds of marijuana; and (e) Steele incurred a "serious medical problem" that "apparently affected his mental functioning" at the time of the offense. R1-77-5-6.

The district court's first ground for departure reflects a belief that Steele was convicted not of unlawful drug trafficking, but of failing to recognize that the prescriptions presented by Larry and Gloria Ellis were forged, which the court described as less culpable behavior. The Guidelines do not list this factor as a ground for departure and do not encourage or discourage courts from considering such a factor. As described earlier in this opinion, however, the government alleged that, and adduced sufficient evidence to prove that, Steele knowingly agreed with Larry Ellis to fill phony prescriptions for a person who had no medical need for the drugs. Moreover, the jury believed this evidence. As summarized by the First Circuit in *United States v. Limberopoulos,* 26 F.3d 245 (1st Cir.1994), this conduct falls expressly within the heartland of a drug trafficking offense as defined by § 841(a)(1). *See* 26 F.3d at 249-51. *Limberopoulos* is

11

factually analogous to this case, as the government claimed that the defendant pharmacists knowingly filled fraudulent prescriptions to people who had no legitimate medical need for the drugs, and the jury refused to believe the defendants' arguments that they acted in good faith. *See id.* at 250-51. As the *Limberopoulos* court explained, "if the drug-dispensing pharmacist knows that a customer not only lacks a valid prescription but also will not use the drugs for legitimate medical purposes, then section 841 applies in full flower and treats the dispenser like a pusher." *Id.* at 250. Consequently, for the same reasons as set forth in *Limberopoulos,* we conclude that the district court abused its discretion in relying on this ground to depart downward.

The district court's second ground for departing downward was that Steele would lose his pharmacist's license, which the district court categorized as a "major additional punishment ... which has not been addressed by the Sentencing Commission." R1-77-5. In an opinion published after the date of the sentencing hearing, this court concluded that the loss of a medical license may not serve as a ground for departure when the offense for which the defendant is convicted reflects an abuse of the trust inherent in the granting of the license to the defendant. *See United States v. Hoffer,* 129 F.3d 1196, 1204-06 (11th Cir.1997). A departure under such circumstances, the court observed, would negate an enhancement for the abuse of a special position to facilitate the crime that is mandated pursuant to other sections of the Guidelines. *See id.* at 1205. The conclusion reached in *Hoffer* applies with equal force here, where the district court's departure based on Steele's loss of his pharmacist license would negate an enhancement imposed for Steele's abuse of his position as a pharmacist. Under these circumstances, *Hoffer* dictates that the district court abused its discretion in departing downward on this ground.

The district court's third ground for departing downward was that the inclusion of the substances with which the drugs were mixed to form tablets and pills when computing the drug weights to be used for sentencing purposes created a disparity when compared to cases involving drugs that are not mixed with other substances. The district court's reasoning, however, directly contradicts the rule set forth in *Lazarchik* for

sentencing defendants who are convicted of offenses involving drugs in pill form. *Lazarchik* mandates that, when computing the amount of drugs attributed to a defendant under the guidelines, the court must include the weight of the substances with which the drugs are mixed to form pills or syrups. *See* 924 F.2d at 214. The ground relied upon by the district court therefore is expressly precluded, because allowing a downward departure on this ground would abrogate the requirement that the substances mixed with drugs be included in the total drug weight. The district court's effort to use section 5K2 to craft a sentence based on the net weight of the drugs therefore constituted an abuse of discretion.

The district court's fourth ground for departing downward was that the defendant made a nominal profit from the sale of the drugs, while the length of his sentence is more consistent with an amount of drugs that has an enormous street value. Lack of personal profit is not a factor that is included in the Guidelines' list of encouraged or discouraged factors, and therefore we must determine whether the nominal profit earned by Steele takes the case out of the "heartland." Courts that have considered downward departures based on this ground have generally disfavored the reasoning relied upon by the district court. *See United States v. Broderson,* 67 F.3d 452, 458-59 (2d Cir.1995); *United States v. Seacott,* 15 F.3d 1380, 1387 (7th Cir.1994). As noted in *Broderson,* "lack of personal profit ordinarily [is not] a ground for departure, because the Commission generally took that factor into account in drafting the Guidelines." 67 F.3d at 459; *see also Seacott,* 15 F.3d at 1387 (observing, after listing several provisions in the Guidelines that address profits by the defendant, that "[g]iven the frequency with which the drafters of the Guidelines specifically adjusted offense levels based on whether the defendant was motivated by profit, we must assume that had they been interested in providing for such an adjustment ... they would have done so"). Here, we confront a case in which the jury concluded that the defendant agreed to sell prescription drugs to a person who notified him beforehand that the prescriptions were phony. In all varieties of drug distribution cases, defendants have experienced difficulties in turning profits and even incurred losses for their efforts. We cannot say that such cases fall outside the heartland of drug distribution cases. Rather, we conclude that, despite the nominal

13

profits earned by Steele in filling the forged prescriptions, this case fails to present sufficiently unusual circumstances that would permit the district court to depart downward pursuant to section 5K2. The district court therefore abused its discretion in relying on this ground.

The fifth ground relied upon by the district court was that Steele had incurred a "serious medical problem" that had affected his mental functioning at the time of the offenses. The Commission expressly encourages district courts to consider whether the defendant suffered from "significantly reduced mental capacity" at the time of the offense when deciding whether to grant a downward departure. U.S. Sentencing Guidelines Manual § 5K2.13. In order to warrant a departure, the diminished capacity must be linked to the commission of the offense. *See United States v. Miller,* 146 F.3d 1281, 1285 (11th Cir.1998), *cert. denied, ---* U.S. ---- 119 S.Ct. 915, 142 L.Ed.2d 912 (1999).

During the pendency of this appeal, the Sentencing Commission amended section 5K2.13 by completely replacing the text of the section and adding an application note. *See* U.S. Sentencing Guidelines Manual § 5K2.13 (Nov.1998 ed.). The application note defines "significantly reduced mental capacity" to mean that the defendant "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." *Id.* application n. 1. The amended section also provides that, "[i]f a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." *Id.* § 5K2.13. The district court made no specific findings whether Steele's diminished mental capacity contributed to the commission of the crime.

Given our earlier conclusion that the district court abused its discretion in relying on the first four grounds for the downward departure granted in this case, we conclude that the present sentence must be vacated and a new sentencing hearing held. During the new sentencing hearing, the amended version of section 5K2.13 will apply. The opportunity thus arises for the district court to determine in the first instance whether the evidence regarding Steele's mental condition continues to justify a downward departure according

to the new language. Moreover, if the court determines that a downward departure indeed is warranted, the court may assess anew the extent of the departure in light of its findings of how much the impairment contributed to the commission of the offense. We therefore decline to reach a conclusion whether the district court abused its discretion in departing on this ground and instead remand the issue to the district court to reassess in light of the changes in the law and posture of this case.

## *VI. Conclusion*

For the reasons set forth in this opinion, we AFFIRM Steele's conviction but VACATE Steele's sentence and REMAND for resentencing proceedings consistent with this opinion.