[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 94-8733

D. C. Docket No. 1:93-00357-CR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FREDRIC W. TOKARS, JAMES H. MASON,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Georgia

**(September 6, 1996)**

Before DUBINA and BLACK, Circuit Judges, and MARCUS*,
District Judge.

DUBINA, Circuit Judge:

_____
*Honorable Stanley Marcus, U.S. District Judge for the
Southern District of Florida, sitting by designation.

Appellants-defendants Fredric W. Tokars ("Tokars") and James H. Mason ("Mason") (collectively, the "defendants") appeal their convictions for various violations of federal law. In addition, Mason challenges his sentence. For the reasons that follow, we affirm.

## I. STATEMENT OF THE CASE

*A. Procedural Background*

On August 25, 1993, a federal grand jury returned an indictment charging Tokars and Mason with various racketeering, drug, and money laundering violations. The grand jury later returned a superseding indictment charging Tokars with racketeering conspiracy, 18 U.S.C. § 1962(d) (Count I); racketeering, 18 U.S.C. § 1962(c) (Count II); violence in aid of racketeering, 18 U.S.C. §§ 1959(a)(1) and 2 (Count III); murder-for-hire, 18 U.S.C. §§ 1958 and 2 (Count V); conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846 (Count VI); money laundering, 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Counts VII, VIII, IX, X and XI); and conspiracy to launder money, 18 U.S.C. § 1956(g) (Count XIII). Mason was charged in Counts I, II, IV (violence in aid of racketeering, 18 U.S.C. §§ 1959(a)(3) and 2), VI, VII, VIII, IX, X, XI, and XIII.

The defendants entered not guilty pleas and moved to change venue based on pre-trial publicity. The district court granted the defendants' change of venue motions, and the trial was moved to Birmingham, Alabama. After the government's presentation of its

2

case-in-chief, the court dismissed Count VII against Mason and Counts VIII and IX against Tokars. The jury returned guilty verdicts against Tokars and Mason on all remaining counts. Tokars was sentenced to concurrent life sentences on Counts I, II, III, and V. As to Counts VI, X, XI, and XIII, Tokars was sentenced to 97 months' incarceration on each count to be served concurrently with each other and concurrently with the life sentences, as well as a $400 special assessment. Mason was sentenced to 200 months' incarceration on each count to be served concurrently, as well as a $450 special assessment. The defendants then perfected this appeal.

*B. Factual Background*

This case involves drugs, money laundering, torture, kidnaping, and murder-for-hire. The case is best explained when divided into two sections: the narcotics money laundering enterprise and the murder of Sara Tokars ("Sara").

1. Narcotics money laundering enterprise

At the trial, Jessie Ferguson ("Ferguson") testified that he and Julius Cline ("Cline") were drug dealers in Detroit, Michigan. In July of 1985, Ferguson moved to Atlanta, Georgia, where he met Mason. Cline also moved to Atlanta, and he and Ferguson invested $75,000 in drug proceeds in the VIP Club. Mason was the manager of the club, and he was listed as an owner in order to obtain a liquor license because Cline and Ferguson were "in trouble" with the authorities in Detroit. Ferguson testified that Cline's principal source of cocaine was "Andrew." Cline transported the cocaine from

3

Miami, Florida, to Atlanta.  Andre Willis ("Willis") testified that he obtained cocaine from Cline until Cline was murdered on July 25, 1992.  Willis distributed the cocaine in Atlanta and Chattanooga, Tennessee.  According to Willis, Cline also obtained cocaine from Al Brown ("Brown"), who was part owner of the Diamonds and Pearls nightclub in Detroit.  Willis testified that he and Cline received and sold approximately twenty kilograms of cocaine per week.  According to Willis, Cline described his relationship with Mason as follows:  "[Mason] was just a front for the nightclubs because [Ferguson] and himself had a criminal record, and they could not get any liquor license in their name, so James Mason would be the front for all the nightclubs."  R62-2059.  According to Willis, Cline owned several clubs, including the VIP, Traxx, the Parrot, and Zazu's, as well as the Park Place Beauty Salon.

Marvin Baynard ("Baynard") met with Tokars in late 1986 to discuss providing a legal defense to drug runner Dexter Askew ("Askew").  Askew had been charged with possession of cocaine that had been provided by Baynard.  Baynard informed Tokars that he sold one-fourth to  one-half a kilo of cocaine per week amounting to between $5,000 and $10,000.  Tokars requested a $10,000 retainer fee and said he would help Baynard "legitimize" himself by incorporating Baynard's business.  Tokars incorporated a business which Baynard used with Alex Yancey ("Yancey"), Baynard's associate in the cocaine business.  Baynard sold drugs from 1986 to 1989 and obtained cocaine from Cline and Greg Johnson ("Johnson") beginning in 1987.  Baynard recalled that Tokars often discussed offshore

4

banks and had a blue book that explained how to set up an offshore bank for $15,000. Baynard did not invest his drug money but instead kept it as cash in his bedroom and, on Tokars's advice, kept the cocaine in another apartment under a different name. Baynard testified that he introduced Johnson to Tokars so that Tokars could launder some of Johnson's drug money.

Murray Silver ("Silver") first met Tokars when Tokars was an assistant district attorney. After leaving the district attorney's office, Tokars shared office space with Silver from approximately July 1986 to October 1989. Silver recalled a conversation with Tokars about a booklet Tokars authored entitled <u>Tax Havens and Offshore Investment Opportunities</u>. The booklet details Tokars's plan for laundering drug money. Tokars asked that Silver refer some of his clients to Tokars. Tokars said that he was not worried about the Internal Revenue Service ("IRS") because he intended to leave no paper trail. Tokars told Silver that he had used this process to help a client who was going through a divorce hide $150,000 from his wife and the IRS by depositing it in his bank in the Bahamas. Silver recalled that Tokars lectured to law enforcement officials on the topic of money laundering. The Director of the Georgia Police Academy testified that Tokars taught courses in money laundering for the academy, as well as for the Federal Law Enforcement Training Academy.

In late December of 1988, Mason, Cline, and Ferguson accused Michael Jones ("Jones") of stealing money from Mason's home. Jones testified that he went to Mason's house where Cline closed and

5

locked the door. Ferguson placed a 9-millimeter handgun on the table and asked Jones whether he knew where the money was. Ferguson then placed the handgun down Jones's throat and threatened to kill him. When Mason returned home, Jones recounted the meeting to him. About thirty days later, Mason asked Jones to meet him at the Park Place Salon. Mason then asked Jones to accompany him home. Ferguson arrived at Mason's home and instructed Mason to leave. Mason left, and Ferguson proceeded to physically torture Jones for two to three hours. Ferguson then put Jones in the bathroom, but Jones escaped. Ferguson testified that he and Cline would often keep large amounts of drug money at Mason's home. Mason told Ferguson that he thought that Jones had stolen the money. Mason hired a private investigator who observed Jones attempting to purchase fur coats and a new car. Ferguson testified that he instructed Mason to get Jones to the house.

Mason and Cline, together with Jim Killeen, Bill Fraser, and William Kohler, formed Zebra, Inc., and Zebra Management, Inc., to operate a club called Dominique's. Mason and Cline contributed $20,000 to the operation but were later removed from Zebra's due to Cline's reputation as a drug dealer. Mason and Cline then opened Traxx. Ferguson testified that he invested $15,000 in Traxx and that Cline invested $45,000.

Mark McDougall ("McDougall"), who had taken cocaine from Mason, testified that he and Zane Carroll ("Carroll") discussed with Tokars their proposed investment in the Parrot nightclub. McDougall and Carroll would own 51% of the club. Billy Carter

6

("Carter") would obtain the liquor license due to McDougall's felony conviction. Tokars and Carter discussed in McDougall's presence that Cline was the silent partner and money man for Mason. Tokars incorporated the Parrot Acquisition Corporation. The shareholder and management agreement reflected Tokars as the club's attorney and Carter and Mason as subscribing to 40,000 and 60,000 shares of stock, respectively. Ferguson testified that Cline invested $40,000 to $60,000 in the Parrot. When McDougall and Carroll were not pleased with the investment return, McDougall threatened Cline with a gun.

Linda Campbell ("Campbell"), who was employed at the Park Place Salon, was assaulted by Mason. She employed an attorney and filed suit against Mason, and her case was settled for $17,500, for which Mason's shares of stock in the Parrot were pledged as collateral. Campbell's attorney testified that Tokars represented Mason and that it was Tokars's idea to pledge the Parrot stock. Campbell employed new counsel who demanded that the stock be assigned to Campbell because Mason had defaulted on payment. Tokars claimed that he was no longer the secretary of the corporation, so a suit was filed against all of the officers and shareholders, including Tokars, Mason, Cline, Carter, and Brown.

After Zebra, Inc., was evicted from Dominique's for non-payment of rent, Mason approached Douglas McKendrick ("McKendrick") claiming that he had an endorsement contract with Deion Sanders ("Sanders"). Sanders testified that he met Mason through Willie Harris ("Harris"). Sanders signed an agreement with Harris, who

7

signed as President of Atlanta Entertainment Management, Inc. In September of 1990, Tokars incorporated Atlanta Entertainment Management, Inc., listing Mason, Cline, and Harris as its directors. Tokars helped finalize the deal with Sanders and the management agreement with McKendrick. Carl Tatum, an employee of the club Deion's, testified that he discussed with Mason the fact that Cline was a cocaine dealer and that Mason knew Cline dealt cocaine.

In 1988, Harris began selling cocaine for Cline as a middle-man brokering transactions with other customers. In one day, Harris received between $250,000 and $500,000. Harris would place the cash, minus his percentage, in a safe at Cline's apartment. Harris once delivered cocaine to Mason at Cline's request. Harris later heard from Mason that the cocaine was intended for a woman in Mason's residential complex. In 1991, Harris was arrested on cocaine charges. Mason paid Tokars $5,000 to help Harris. Tokars filed affidavits at Harris's bond hearing stating that neither Mason nor Cline knew Harris to sell, distribute, possess, or consume illegal drugs. However, this was after Harris had delivered the cocaine to Mason and had conducted a substantial cocaine business on behalf of Cline. After obtaining bond, Harris met with Tokars, who advised him that he would be found guilty and receive a substantial sentence unless he could "set someone up." Tokars suggested setting up Cline, but Harris refused. Harris testified that Tokars then said that Harris was right that he could not set up Cline "because if you do Julius [Cline], it will role

8

[sic] down and get James [Mason] because everybody knows James doesn't have any money, and he gets his money from Julius." R62-1912.

Harris and Mason decided to open a new club, and Mason claimed that he had secured $50,000 from Brown to open it. John Vara ("Vara") testified that through his corporation, JDV, he sold the leasehold rights to Diamonds and Pearls to Mason for $25,000. The closing was held at Tokars's office in November of 1991. Vara was introduced to Brown by Mason, who said that Brown was part of management. Mason and Tokars used Atlanta House Clubs, Inc., as the purchaser of the lease.

In the spring of 1992, Tokars introduced Eddie Lawrence ("Lawrence") to Mason at Diamonds and Pearls. Tokars also introduced Lawrence to Cline, Willis, and Harris. Tokars told Lawrence that Cline was a drug dealer and that Mason was a client for whom he laundered drug money. Lawrence testified that Tokars and Mason said that $500,000 was used to renovate Diamonds and Pearls.

In 1992, Cline began receiving cocaine from Brown. At the time, Cline was renovating Traxx, which was to be renamed the Phoenix. Willis testified that Cline was angry with Mason due to the loss of the Parrot. Cline asked Willis to invest $150,000 in the Phoenix. Willis was to obtain the money from cocaine sales. Cline told Willis that he "had a white friend that was an attorney and judge that was advising him on how to invest his money in the right way" and was helping him with the clubs. R63-2080.

9

On August 5, 1992, a car carrying 115 kilograms of cocaine was stopped in Amarillo, Texas. The Drug Enforcement Agency ("DEA") airlifted the car to Atlanta, and the driver agreed to cooperate. Following an intermediary's arrest, the cocaine was delivered to Brown, who was then arrested. A search of Brown's car revealed a business card identifying Brown and Mason's association with Peachtree Entertainment, weekly reports of Diamonds and Pearls, two digital beepers, and $49,700 in cash. DEA agents later executed two search warrants for Brown's residence and found a money counting machine, a bulletproof vest, digital beepers, and records. Tokars represented Brown at an August 11, 1992, detention hearing. Assistant United States Attorney Janis Gordon ("Gordon") expressed to Tokars that the government was interested in Brown's cooperation. Gordon noted that since Tokars had incorporated Diamonds and Pearls,[1] she mentioned to him that he might have a potential conflict in representing Brown. Gordon said that if the government attempted to seize the nightclub, Tokars might be called as a witness.

Mason represented to the DEA and IRS agents that he was the 100% owner of Diamonds and Pearls and that Brown only served as the "doorman" and handy man for the club. Mason was then subpoenaed to produce all records of the club. When Tokars learned

---

[1]     Tokars had incorporated Diamonds, Inc., and Diamonds and Pearls, Inc., identifying Mason as the sole director. Tokars also incorporated Peachtree Entertainment Group, Inc., with Mason and Brown as directors.

10

about the subpoena, he referred Mason to another attorney. Tokars later told AUSA Gordon that Brown had fired him.

The records of Diamonds and Pearls and Atlanta House Clubs, Inc., were also being sought in connection with separate civil litigation. James McCreary ("McCreary"), an attorney for Twilights, Inc., requested that Tokars provide Twilights with information about Atlanta House Clubs, Inc., and its operation of Diamonds and Pearls. Contrary to Mason's assertions to the DEA and the IRS, Tokars claimed that Atlanta House Clubs, Inc., did not exist, was defunct, and had no assets. Tokars said that although the liquor license was obtained in the name Atlanta House Clubs, Inc., the actual company was Diamonds, Inc., which Tokars claimed was owned by Mason. Twilights sued Atlanta House Clubs, Inc., and Mason and Cline for failing to pay the additional $50,000 required for the purchase of Zazu's. At the time of the default, Jeff Ganek, Twilights's attorney, advised his client to liquidate the nightclub, but when he discovered a liquor license advertisement by Atlanta House Clubs, Inc., for Diamonds and Pearls, he suggested that the company attempt to collect the $50,000.

Tokars told McCreary that he thought Atlanta House Clubs, Inc., had no assets but that he had just discovered some assets. Tokars informed McCreary that Cline had used Atlanta House Clubs, Inc., to operate another club, the Phoenix. Tokars suggested that if Twilights would dismiss Mason from the lawsuit, Tokars and Mason would help Twilights obtain a judgment against Atlanta House Clubs, Inc. Tokars told McCreary that following Cline's murder, members

11

of his family were operating the Phoenix. As a result, Tokars suggested that Twilights might be able to satisfy its claim through Cline's estate. Tokars told McCreary that Cline's murder was drug-related. Tokars represented that Zazu's was Cline's venture and that Cline had been very upset with McCreary's clients, even to the point of wanting to murder one of them.

2.   The Murder of Sara Tokars

During a political fundraiser reception, Tokars stated that his wife Sara had recently been in his office working on his accounts receivable. Sarah Suttler ("Suttler"), the Tokars' neighbor, testified that Sara often discussed divorcing Tokars but was afraid she would not get custody of their two sons. In the fall of 1992, Suttler said Sara was elated and said "I can divorce Fred now because I have the goods on him, and he'll not get my boys . . . I have found papers of income tax evasion." R69-3671. According to Suttler, Sara gave the information to a private detective and she felt protected by this.

In 1991, Lawrence employed Yancey in the construction business. Lawrence knew Yancey to be a cocaine dealer. Yancey asked Lawrence for $20,000, but Lawrence, who did not have $20,000, gave Yancey only $10,000 to purchase cocaine. Lawrence said that they could re-sell the cocaine and make the remainder of the $20,000. Lawrence advanced the money, but the plan failed. Yancey then decided to produce counterfeit money in order to repay Lawrence. The United States Secret Service ("Secret Service") began investigating their activities. Lawrence testified that he

12

and Yancey would pass counterfeit money by going to nightclubs, buying drugs, and then reselling the drugs for legitimate money. Yancey and Lawrence eventually became aware of the Secret Service investigation.

Yancey introduced Lawrence to Tokars. Yancey and Lawrence informed Tokars of their counterfeiting activities. Tokars suggested that he could take the counterfeit money and distribute it in the Bahamas, but the two declined. Lawrence hired Tokars, but Yancey fled and was arrested in December of 1993. The Secret Service confronted Lawrence, but he denied his involvement in the scheme. Lawrence, accompanied by Tokars, agreed to go to the Secret Service office where Lawrence took a polygraph test. Tokars was told that Lawrence tested deceptive when asked about his involvement in passing counterfeit money. Lawrence testified that he and Tokars then began conducting a money laundering business. The two used Lawrence's construction business as a front and also incorporated several other businesses that were used to launder money. Lawrence solicited drug dealers by going to nightclubs. Tokars advanced approximately $70,000 to Lawrence for operating expenses. Tokars discussed with Lawrence how he used offshore banks to launder money.

In late July or early August of 1992, Tokars asked Lawrence if he would kill somebody. In mid-September, Tokars asked Lawrence to kill his wife Sara because she wanted to divorce him and take everything. In another discussion, Tokars told Lawrence that Sara wanted the house and his money. Lawrence advised Tokars, "Let her

13

have it," saying that "he could always get that back." R65-2700. According to Lawrence, Tokars stated "that he worked too hard, he went to school at night, and she never did anything. All she ever did was spend his money, and that he wasn't going to give it to her. He would kill her first." Id. During a later discussion, Lawrence asked about Tokars's children. Lawrence recalled that Tokars said, "They will be alright. They will get over it. They are young. They will get over it." R65-2700-01. Lawrence testified that Tokars "just wanted it done" and said that "she was putting pressure on him and he wanted to kill her. That was what he wanted to do, he wanted her dead." R65-2701.

Tokars first indicated that the murder should occur in his office because he could cover it up due to his influence in Atlanta. Lawrence would not agree. Tokars then decided it should happen in their home so it would look like a burglary. Tokars offered to pay Lawrence $25,000 plus a portion of the life insurance proceeds. In August of 1989, Tokars had increased the life insurance proceeds on Sara from $250,000 to $1,750,000. Tokars continued to pressure Lawrence to kill Sara, going so far as to threaten to destroy Lawrence's business if he would not comply. Lawrence testified that Tokars said that he did not care who did it. Lawrence contacted Curtis Rower ("Rower") and offered him $5,000 to commit the murder. Rower agreed. On the Monday or Tuesday prior to Thanksgiving of 1992, Tokars informed Lawrence that Sara would be going to Florida and that he wanted her killed

14

when she came back.  Tokars was scheduled to be in Alabama meeting with a prisoner at that time, so he would have an alibi.

Sara's father testified that Sara and the two children drove to Florida and arrived on the Tuesday before Thanksgiving and that Tokars flew into Tampa the same day.  Tokars returned home on Saturday and requested that Lawrence meet him the next day. Lawrence met Tokars at his law office, and Tokars informed Lawrence that Sara had already left Florida and would arrive in Atlanta around 8:00 or 9:00 p.m.  Tokars checked into a Montgomery hotel and called his answering service to leave the number where he could be reached in case of an emergency.  That same day, there were many phone calls involving telephones associated with Tokars, Lawrence, Sara's father, and the Montgomery hotel.

The record demonstrates that Lawrence picked up Rower around 7:00 p.m.  Rower was equipped with a sawed-off shotgun.  Lawrence left Rower at the Tokars residence and instructed him to kill a white female about age forty.  Lawrence drove to a neighboring subdivision to wait.  About two hours later, Lawrence saw Sara's white 4-Runner vehicle driving off the road.  Rower got out of Sara's vehicle and ran toward Lawrence.  They then drove to Atlanta because Rower wanted to buy some drugs.

Rower testified that when Sara arrived home, he made her get back into her vehicle and leave to take him to Atlanta.  Rower claims that they pulled over, that Lawrence approached, and that Lawrence grabbed the gun, which went off.

15

Stipulated testimony indicated that Sara died from a gunshot wound to the head delivered from a distance of approximately one foot or less. Sara's two small children were in the vehicle at the time of the murder.

Wilbert Humphries ("Humphries"), a money launderer, was in custody in Montgomery, Alabama, in November of 1992. He was surprised to receive a visit from Tokars on the Sunday after Thanksgiving. At the jail, Tokars asked Humphries to sign some papers. Humphries attempted to talk with Tokars about the case, but Tokars "talked to me very brief like he was in a hurry or something." R66-3035. This meeting lasted only about ten minutes.

On the Monday following the murder, a cousin of Sara's, Mary Rose Taylor ("Taylor"), contacted Sara's sister, Christine Ambrusko ("Ambrusko"), asking her to find the papers of Tokars that Taylor had asked Sara to copy. Taylor went to Ambrusko's house, found the documents, copied them, and delivered them to the police. These records reflected off-shore bank accounts in the Bahamas and a Class B licensed bank issued by Montserrat. Ambrusko testified that Sara requested that she keep the documents in a safe place and give them to the police if anything happened to Sara. According to Ambrusko, Sara wanted to divorce Tokars but was concerned that he would take the children. Ambrusko also said that Sara was "very scared and intimidated." R68-3556.

According to Sara's sister, Gretchen Ambrusko Schaeffer ("Schaeffer"), after the murder Tokars appeared "very anxious, and he was making loud noises, kind of moaning and saying, 'I'm so

16

afraid' and 'I'm scared,' in a loud tone of voice, very nervous appearing." R67-3228. During a conversation with his mother and Schaeffer, Tokars said that he did not want to help the police because he did not want them to look into his business dealings.

On December 6, Tokars, in the presence of counsel, was interviewed by the police. During the interview, Tokars admitted that his clients were criminals, and he specifically mentioned Mason because of Cline's murder, the arrest of Brown, and the murder of Brown's brother. Tokars said that Mason and Cline were partners in the Parrot Club and that Mason owned Diamonds and Pearls. Tokars also admitted that he assisted Mason in incorporating the Parrot Club and that he represented Mason in a number of civil suits. Tokars further admitted that Sara had previously hired an attorney to seek a divorce. Later that evening, with Tokars's consent, police and federal agents searched Tokars's residence and seized Tokars's calendars for 1988, 1989, and 1990.

Lawrence was arrested on December 12 for writing bad checks. He was questioned about Sara's murder but denied involvement. Lawrence was released but then was charged for writing another bad check. While Lawrence was again in custody, a private investigator for Tokars questioned him about the murder. On December 20, the police again interviewed Tokars regarding why he never previously mentioned his connection with Lawrence. Tokars claimed that he had discussed their corporations and that all of his dealings with Lawrence were matters of public record. Tokars described Lawrence

17

as a business partner, and he acknowledged that he met Lawrence in connection with the Secret Service's investigation of Yancey. Tokars mentioned that "Mason was an ongoing, regular client of mine." R69-3808.

The police arrested Lawrence and Rower on December 23, 1992. A police officer called Tokars at Sara's father's home to inform him of the arrest. Tokars simply said "okay." R67-3162. Sara's father, Dr. Ambrusko, recalled that Tokars had no reaction to the news. Following the call, Dr. Ambrusko asked Tokars to tell the family about Lawrence. In response, Tokars stated that he did not believe Lawrence was involved. Neal Wilcox, Sara's brother-in-law, testified that during a conversation with Tokars later in the evening, Tokars "kept repeating to me that he was worried about the police making a deal." R67-3216. Tokars claimed that the police "were using these guys to get to him, and he was worried about the police making a deal for their testimony against [him]." Id.

On Christmas Eve, Tokars failed to go on a family outing to Busch Gardens. As time passed without contact from Tokars, Dr. Ambrusko became worried. He went to look for Tokars and found him unconscious in his hotel room. The police found a suicide note. Tokars survived this suicide attempt.

## II. ISSUES

The defendants raise the following issues on appeal:

1. Whether the district court erred in denying the defendants' challenges to the government's use of peremptory strikes.

2. Whether the district court erred in admitting the statement Rower made at his bond hearing.

18

3.  Whether the district court erred in admitting hearsay statements made by Sara.

4.  Whether Tokars was prejudiced by misrepresentations regarding the polygraph exam and the failure to produce the exam.

5.  Whether Tokars had the opportunity to cross-examine Lawrence.

6.  Whether the district court erred in denying Tokars's motion to suppress evidence seized from Tokars's residence.

7.  Whether the district court abused its discretion in its admission of various items of evidence.

8.  Whether the jury charge on Count V was proper.

9.  Whether sufficient evidence supports Mason and Tokars's convictions.

10. Whether the district court erred in denying Mason's motion for a new trial.

11. Whether the district court properly permitted the jury to find that Tokars committed racketeering act nine.

12. Whether the district court abused its discretion in moving the trial to Birmingham, Alabama.

13. Whether the district court erred in granting only one continuance of the trial.

14. Whether the district court abused its discretion in denying Mason's motion for severance from Tokars.

15. Whether cross-examination of Ambrusko was properly limited.

16. Whether the prosecutor engaged in misconduct.

17. Whether the district court properly refused Tokars's theory-of-the-case charges.

18. Whether the district court violated Tokars's due process rights by prohibiting comments by the attorneys on dismissed charges.

19. Whether the references to violence and fear and other prejudicial evidence denied Tokars a fair trial.

20. Whether Mason was properly sentenced.

21. Whether this court's limitation of Tokars's brief denied him the effective assistance of counsel or due process on appeal.

19

## III. STANDARDS OF REVIEW

A district court's findings regarding whether a peremptory strike was exercised for a discriminatory reason largely involves credibility determinations and is therefore entitled to great deference. See Batson v. Kentucky, 476 U.S. 79, 98 n.21, 106 S. Ct. 1712, 1724 n.21, 90 L. Ed. 2d 69 (1986). Thus, we review a district court's finding in this respect only for clear error. See Hernandez v. New York, 500 U.S. 352, 364-65, 111 S. Ct. 1859, 1868-69, 114 L. Ed. 2d 395 (1991) (plurality); id. at 372, 111 S. Ct. at 1873 (O'Connor, J., concurring) (agreeing with the plurality that district court's finding should be reviewed for clear error); United States v. Alston, 895 F.2d 1362, 1366 (11th Cir. 1990).

This court reviews a district court's evidentiary rulings for abuse of discretion. United States v. Walker, 59 F.3d 1196, 1198 (11th Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 547, 133 L. Ed. 2d 450 (1995).

We review findings of fact on a motion to suppress evidence for clear error; the district court's application of the law to those facts is subject to de novo review. United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993).

A challenge to a jury instruction presents a question of law subject to de novo review. United States v. Chandler, 996 F.2d 1073, 1085 (11th Cir. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2724, 129 L. Ed. 2d 848 (1994). We review a district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Maduno, 40 F.3d 1212, 1215 (11th Cir.

20

1994), cert. denied, ___ U.S. ___, 116 S. Ct. 123, 133 L. Ed. 2d 72 (1995).

Whether there was sufficient evidence to support a conviction is a question of law subject to de novo review. United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990), cert. denied, 499 U.S. 978, 111 S.Ct. 1628, 113 L. Ed. 2d 724 (1991). We view the evidence in the light most favorable to the government with all reasonable inferences and credibility choices made in the government's favor. Id.

A trial court's denial of a motion for new trial is reviewed for an abuse of discretion. United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985).

The granting of a motion for a change of venue is reviewed for abuse of discretion. United States v. Williams, 523 F.2d 1203, 1208 (5th Cir. 1975).[2]

A denial of a motion for a continuance is reviewed for an abuse of discretion and specific, substantial prejudice. United States v. Bergouignan, 764 F.2d 1503, 1508 (11th Cir. 1985), cert. denied, 484 U.S. 1044, 108 S. Ct. 778, 98 L. Ed. 2d 864 (1988).

Denial of a severance motion is reviewed for abuse of discretion. United States v. Harper, 680 F.2d 731, 733 (11th Cir.), cert. denied, 459 U.S. 916, 103 S. Ct. 229, 74 L. Ed. 2d 182 (1982).

---

[2]     In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

21

Whether the trial court erred in limiting cross-examination is reviewed for a clear abuse of discretion. United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992). However, the district court's discretion in limiting the scope of cross-examination is subject to the requirements of the Sixth Amendment's guarantee of the right of confrontation. Id.

This court usually may only reverse a conviction based on a prosecutor's remarks if those remarks are improper and prejudicial to the defendant's substantive rights. United States v. Cannon, 41 F.3d 1462, 1469 (11th Cir.), cert. denied, ___ U.S. ___, 116 S. Ct. 86, 133 L. Ed. 2d 44 (1995).

The question whether a particular sentencing guideline applies to a given set of facts is a question of law reviewed de novo. United States v. Shriver, 967 F.2d 572, 574 (11th Cir. 1992). This court reviews a trial court's determination of the quantity of drugs used to establish a base offense level for sentencing purposes under the clearly erroneous standard. United States v. Taffe, 36 F.3d 1047, 1050 (11th Cir. 1994).

### IV. ANALYSIS

Initially we note that many of the issues in this case are subject to review for an abuse of discretion. Our review of the record persuades us that the district court did not abuse its discretion in moving the trial to Birmingham, Alabama; in granting only one continuance of the trial; and in denying Mason's motion for severance from Tokars. Moreover, we conclude that Tokars's arguments regarding issues nineteen and twenty-one are meritless.

22

Accordingly, we summarily affirm the district court's disposition of these issues.[3] The remaining issues meriting discussion are addressed infra.

A.    *J.E.B. v. Alabama ex rel T.B.*

The defendants argue that the government purposefully discriminated on the basis of gender in violation of J.E.B. v. Alabama ex rel T.B., 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994), by exercising its peremptory challenges to remove men from the venire. The government exercised its first ten strikes to remove men, and after an objection by Tokars, the government struck three men and three women. After the jury was struck, the district court heard the defense challenge. When confronted by the defense allegation that the government was impermissibly striking, the government argued that there was a smaller number of women in the venire and that the defense engaged in its own practice of striking women.[4]    The government then conceded:

> [W]e did not strike men just to strike men, nor did we strike women just to strike women . . . In fact, the defendants could have wiped out the entire sex of women with their strikes and still had five to go, and as a matter of principle, I think every sex should be represented in a trial of this nature as should every race be represented, and so we undertook a course of action anticipating the defendants would do what they

---

[3]    See Eleventh Cir. Rule 36-1.

[4]    Although not relevant to our analysis, we find it interesting that Tokars's counsel intimated his own discriminatory views during the challenge conference: "[M]y reading of the Government's strikes was that it was almost all straight males, and then at the end out of the last four, I think they struck three females, one black female and two regular females." R56-531 (emphasis added).

23

did, which was strike almost in the exact opposite proportion of women to men, because if you look at the balance, the greater proportion of their strikes were women.

R56-532-33. The government also argued that men had not been declared to be a cognizable group for purposes of a Batson challenge.

Regarding the challenge the district court stated:

I don't think men do constitute a cognizable group for Batson. There is a case in the Supreme Court presently regarding whether women constitute a cognizable group. The holding of the circuit[s] so far, the Fifth Circuit has held that women do not constitute a cognizable group. So have the Fourth and [the] Seventh. The Ninth Circuit has gone the other way. I do not know of any circuit decision that has held that men are a cognizable group . . . I do not think the challenge is valid. However, given the degree of novelty of the issue, Mr. Parker, do you and Ms. Monahan want to place on the record what your reasons were for striking the men that you struck?

R56-534-35. The government proceeded to state gender-neutral reasons for each of its strikes. The district court overruled the defendants' objections, and the case proceeded to trial with a jury composed of eight men and four women.

After the jury returned its verdict in this case, the Supreme Court decided J.E.B., thereby extending Batson to gender. Consequently, Mason moved for a new trial. The district court conducted a hearing on the motion and determined that J.E.B. should not be applied retroactively because it was not forecast by prior decisions to the same degree as was Batson. The district court's conclusion regarding the retroactivity of J.E.B. was incorrect in light of the Supreme Court's decision in Griffith v. Kentucky, 479 U.S. 314, 328, 107 S. Ct. 708, 716, 93 L. Ed. 2d 649 (1987), which

24

mandates that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."

However, the district court also found that the government's proffered reasons were non-pretextual and explained:

> Finally, I do recognize that an inference of discrimination, whether it be race discrimination or gender discrimination, can be inferred from a pattern of strikes. Now, in this case it is true that the government utilized 13 of its 16 strikes to strike men. However, in determining whether an inference of discrimination may properly be raised, I think it is appropriate to consider the factual setting as a whole, and in this case the factual setting reflects that the panel that we began with, the panel of, I believe it is, 56 disproportionally represented men. Apparently 55 percent of that panel consisted of men. In addition to that, the record reflects that the defendants collectively struck a disproportionate number of women. Therefore, the setting within which the government exercised its strikes was a setting within which women were under-represented both as a product of the initial makeup of the panel, and as a product of the pattern of strikes reflected by the defendant's [sic] strikes.

R79-67-68.

The Supreme Court has established a three-step analysis to be applied when addressing a claim that peremptory challenges were used in a manner that violates the Equal Protection Clause. See Hernandez v. New York, 500 U.S. 352, 358-59, 111 S. Ct. 1859, 1865-66, 114 L. Ed. 2d 395 (1991) (plurality opinion). First, the party challenging the peremptory strike must establish a prima facie case that the prosecutor exercised the peremptory strikes for a discriminatory reason. See id. Second, if the prima facie case

25

has been established, the burden shifts to the proponent of the peremptory challenge to articulate a gender-neutral explanation for the strike. See id. The Supreme Court clarified that in order to satisfy step two, "a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." Purkett v. Elem, ___ U.S. ___, ___, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995) (per curiam). Third, the trial court must ascertain whether the opponent of the strike has carried his or her burden of proving intentional discrimination. Hernandez, 500 U.S. at 359, 111 S. Ct. at 1866. The district court's findings on the issue of discriminatory intent are entitled to great deference and are reviewed for clear error. Id., 500 U.S. at 364-65, 111 S. Ct. at 1868-69.

This case presents a situation of mixed motives. It is apparent from the government's statements following Tokars's challenge that gender was indeed a factor that was considered in exercising its strikes. Tokars and Mason argue that this statement constitutes a blatant admission of discriminatory intent that negates the relevance of any other non-discriminatory reasons offered. As such, Tokars and Mason contend that the government's actions violated J.E.B. This circuit, however, has recently joined three other circuits in adopting dual motivation analysis for purposes of Batson. See Wallace v. Morrison, 87 F.3d 1271 (11th Cir. 1996) (applying dual motivation where prosecutor stated that race was a factor considered in the exercise of peremptory strike); United States v. Darden, 70 F.3d 1507, 1530-32 (8th Cir. 1995)

26

(applying dual motivation where prosecutor struck on basis of youth, inexperience, and alleged young black female tendency "to testify on behalf and be more sympathetic toward individuals who are involved in narcotics"), cert. denied, ___ U.S. ___, 116 S. Ct. 1449, 134 L. Ed. 2d 569, and cert. denied, ___ U.S. ___, 116 S. Ct. 2567, ___ L. Ed. 2d ___ (1996); Jones v. Plaster, 57 F.3d 417, 421-22 (4th Cir. 1995) (applying dual motivation but remanding to district court for clarification of findings regarding whether the strike was exercised for a discriminatory purpose and whether it would have been exercised in the absence of the discriminatory purpose); Howard v. Senkowski, 986 F.2d 24, 27-31 (2d Cir. 1993) (applying dual motivation to prosecutor's pre-Batson statements).

Dual motivation analysis grants the proponent of a strike the opportunity to raise an affirmative defense after the opponent of the strike has established a prima facie case of discrimination. Wallace, 87 F.3d at 1274-75; Howard, 986 F.2d at 30. In order to prove this affirmative defense, the proponent of the strike bears the burden of proving by a preponderance of the evidence that the strike would have been exercised even in the absence of the discriminatory motivation. Wallace, 87 F.3d at 1275.[5]

After a careful review of the record, we conclude that the district court's findings that the government offered gender-

---

[5] In Howard, the Second Circuit held that the dual motivation analysis used by the Supreme Court in the constitutional context should apply to Batson challenges. See, e.g., Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 270-71 n.21, 97 S. Ct. 555, 566 n. 21, 50 L. Ed. 2d 450 (1977); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977).

neutral reasons for the strikes is not clearly erroneous. The district court conducted a hearing during which it reviewed each of the government's reasons for striking the jurors and found them to be gender-neutral. In making a finding of no pretext, the district court in effect made the appropriate findings necessary for dual motivation analysis. Applying dual motivation, we conclude that the government would have exercised the strikes in the absence of any discriminatory motivation.[6]

Finally, we note that resort to dual motivation analysis will rarely be necessary. By now, no competent prosecutor or defense attorney is unaware of the fact that strikes on the basis of race or gender are prohibited. The procedural posture of this case is unusual in that the law at the time of trial was unclear as to whether Batson would be extended to gender. Unlike the respondent in J.E.B., the government in this case expressed that it was not striking men on the basis of stereotyping. Furthermore, both the

---

[6] We acknowledge that in Purkett, the Supreme Court stated that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, ___ U.S. at ___, 115 S. Ct. at 1771. However, we do not perceive this language to prohibit the application of dual motivation analysis. In Purkett, the Court faced the question whether the proponent of the strike should be required to present a plausible or persuasive reason for striking a juror in order for the reason to be considered race-neutral. Id. The Court found that such a requirement stopped the analysis too early and, in effect, relieved the burden of persuasion regarding discriminatory motivation from the opponent of the strike. Id. As such, the Court found that the proponent of the strike may offer an implausible reason as long as it is not race-based on its face. Id. Whereas the opponent of the strike in Purkett sought to avoid its burden of persuasion in the face of an implausible explanation, the dual motivation analysis provides an affirmative defense to the proponent of the strike but does not take away the ultimate burden of persuasion from the opponent of the strike.

28

prosecutor and defense counsel could have raised a J.E.B. challenge. Moreover, the jury itself ultimately consisted of eight men and four women. While the ultimate composition of the jury does not nullify the possibility of gender discrimination, it is a significant factor in the highly deferential review we afford the district court's conclusions. See United States v. Jiminez, 983 F.2d 1020, 1023-24 (11th Cir.), cert. denied, 510 U.S. 925, 114 S. Ct. 330, 126 L. Ed. 2d 276 (1993).

B.   Rower's Bond Hearing Statements

Tokars argues that the district court erred in admitting the out-of-court testimony offered by Rower during his Cobb County bond hearing under Federal Rule of Evidence 804(b)(3).[7]   At least portions of the Rower bond hearing testimony were, in fact, relevant statements made by Rower against his penal interest within the meaning of Rule 804(b)(3).   Moreover, because Rower was unavailable to testify at trial, and because his statement regarding Lawrence's offer of $5,000 to commit murder and his

_____

[7]   Federal Rule of Evidence 804(b)(3) provides:

> The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.   A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

29

statements admitting the kidnapping were made against his penal interest and were corroborated by other evidence in the case, we conclude that the statements were properly admitted.

If there was any error in the admission of the Rower testimony, however, such error was harmless. None of the testimony directly inculpated Tokars. The testimony was only relevant as to Tokars's involvement in the kidnapping insofar as it demonstrated that Sara Tokars was, in fact, kidnapped. However, the testimony of Lawrence and Detective McEntyre, considered independent of Rower's testimony, was more than sufficient to prove the fact that Sara Tokars was kidnapped. Furthermore, the evidence crucial to Tokars's guilt regarding the murder-for-hire scheme was that which related to his dealings with Lawrence, not that which related to Lawrence's dealings with Rower, the main subject of Rower's testimony. Finally, although Rower's testimony may have been corroborative, in part, of Lawrence's testimony, Tokars impeached Lawrence on cross-examination, and Rower's testimony contradicted Lawrence's in some respects. Thus, any corroboration of Lawrence's testimony by Rower had a minimal effect on the jury's perception of Lawrence's credibility.[8]

---

[8] Tokars also argues that the district court erred in not allowing him to introduce the entire statement under Federal Rule of Evidence 106 (rule of completeness) and 806 (impeachment of declarant). However, after the district court refused, Tokars's counsel asked instead to introduce only certain portions of the statement, which the court allowed. After reviewing the record, we are persuaded that the district court did not abuse its discretion in limiting the introduction of the remainder of the statement. Moreover, assuming arguendo that the district court erred, any error was harmless.

30

*C.    Hearsay Statements of Sara*

The government introduced through several witnesses statements made by Sara regarding her state of mind and the course of conduct with respect to certain documents.  The government offered each of the contested statements under one of two theories:  "(1) to demonstrate the state of mind of Sara Tokars, over the course of an approximately three-year period, as to her intent to divorce Tokars and to show how the evolution of her state of mind over that period provided a motive for Tokars to scheme to murder her; and (2) to demonstrate a course of conduct, most often that of various persons relating to copies of certain documents found by Sara Tokars that were incriminating as to Tokars and that eventually were turned over to both state and federal law enforcement officials after the death of Ms. Tokars."  Government's Br. at 69.  The government argues that, with respect to the first theory, the statements fall within Federal Rule of Evidence 803(3), [9] and, pursuant to the

---

[9]    Federal Rule of Evidence 803(3) states as follows:

The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

second theory, the statements are not "hearsay" as defined in Federal Rule of Evidence 801(c).[10]

Regarding the first theory, we conclude that, at least when relevant to the motive to kill, evidence of the victim's state of mind is admissible under Federal Rule of Evidence 803(3). See United States v. DiNome, 954 F.2d 839, 846 (2d Cir.) (statements about victims' existing and ongoing suspicions concerning defendant's exportation business relevant to show motive to kill), cert. denied, 506 U. S. 830, 113 S. Ct. 94, 121 L. Ed. 2d 56 (1992); United States v. Donley, 878 F.2d 735, 738 (3d Cir. 1989) (statements showing that victim intended to move out of military apartment and separate from defendant), cert. denied, 494 U.S. 1058, 110 S. Ct. 1528, 108 L. Ed. 2d 767 (1990). Tokars claims that a homicide victim's state of mind is not sufficiently relevant to admit out-of-court statements of fear unless the defense is self-defense, suicide, or accidental death, citing for this proposition United States v. Kaplan, 510 F.2d 606 (2d Cir. 1974). However, Kaplan involved possession with intent to distribute and distribution of heroin, not homicide, and the declarant's state of mind was not an issue. Tokars knew of the change in Sara's state of mind when he asked Lawrence to kill her. The fact that she wanted to divorce him and take all of his money is what apparently

---

[10]     Federal Rule of Evidence 801(c) provides: " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

prompted him to have her killed. Consequently, Sara's state of mind was extremely relevant to Tokars's motive to kill.

With respect to the second theory, we agree with the government that the challenged statements do not constitute hearsay at all. They were offered to explain the course of conduct that occurred when Sara informed Taylor of the existence of the documents, delivered them to Ambrusko, and directed that they be turned over to the police if anything happened to her. Because they were not offered to prove the truth of the matter asserted, these statements were not hearsay. Moreover, establishing the course of conduct between the deposit of the documents with Ambrusko and their eventual submission to the police was relevant to this case. For the foregoing reasons, we see no abuse of discretion in the district court's admission of Sara's statements.

*D. Prejudice — Misrepresentations and Polygraph*

Tokars argues that the government failed to produce the results of two polygraph exams administered to Lawrence. The government did release the Secret Service polygraph to the defendants.[11] At trial, the district court found that there was no

---

[11] Tokars contends that the admission of the Secret Service polygraph of Lawrence was error. Pursuant to United States v. Piccinonna, 885 F.2d 1529, 1536 (11th Cir. 1989) (en banc), polygraph evidence may be admitted to impeach or corroborate testimony of a witness at trial within the court's discretion, so long as the opposing party has adequate notice of the evidence and an opportunity to secure its own polygraph. During his opening statement, Tokars claimed that his relationship with Lawrence was that of a businessman investing in a rising entrepreneur. Tokars acknowledged the existence of the polygraph test and in fact consented to the test. The polygraph was not introduced to prove

33

Brady[12] or Giglio[13] material in the results of the polygraph, which was administered to Lawrence to enable him to enter the Witness Protection Program. Counsel for Tokars then asked for the questions that were asked of Lawrence, and the government disclosed these two questions: "Do you have any specific plans to locate or harm another witness in the program? Do you have any specific plans to intimidate or threaten another witness in the program?" R64-2561. In its brief, the government concedes that one could reasonably infer from its disclosure of only two questions that in fact only two questions were asked. On cross-examination, Lawrence indicated that he was asked six or seven questions and in response to questions gave the impression that he was polygraphed regarding the truthfulness of his testimony about Tokars. Tokars charged that Lawrence was lying about the number of questions but then discovered that there were in fact more than two questions. The district court ordered the government to produce the entire list of questions. The court concluded that it had no opinion as to whether Lawrence had intentionally lied; however, the court expressed concern over the matter of giving the jury the impression that Lawrence had been polygraphed regarding his testimony about

---

that Lawrence told the Secret Service the truth, but to prove that Lawrence had been deceptive and that Tokars was so informed. Thus, we see no error in the admission of the polygraph exam. However, even assuming that the admission was erroneous, any error was harmless.

[12] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[13] Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

Tokars. The district court resolved the issue by allowing the government, over objection, to read a statement to the jury confirming that Lawrence was given a polygraph exam before entering the Witness Protection Program, but which stated that he was never asked any questions regarding whether his testimony at trial was or would be truthful.[14] We are persuaded that the district court corrected any possible error by allowing the government to inform the jury that Lawrence was not questioned during the polygraph examination about his testimony regarding Tokars.[15]

E.    *Opportunity to Cross-Examine Lawrence*

Tokars claims that he was "deprived of a thorough cross-examination of Lawrence due to the quashing of his subpoenas." Tokars' Br. at 23-25. The State of Georgia provided Lawrence with discovery, which included Tokars's statements, witness statements, and various records. Tokars sought pre-trial production of these documents pursuant to a Federal Rule of Criminal Procedure 17(c) subpoena. The district court found that the State of Georgia

---

[14]    The government stated to the jury:

On October 27, 1993, in connection with Mr. Lawrence's entry into the Bureau of Prisons Witness Protection Program, he was given a polygraph examination. He was never asked, nor did he ever answer any questions as to whether his testimony in any trial was or would be truthful. He was asked whether, in answering the questions by the polygrapher, would he answer the questions truthfully.

R71-4196.

[15]    We note that during closing argument, Tokars's counsel argued that Lawrence lied about the questions he was asked in the polygraph examination.

35

provided Tokars with all discovery materials that were provided to counsel for Lawrence and quashed the subpoena.  The district court gave additional reasons for its decision to quash the subpoena, but did so in a sealed order because the discussion revealed Tokars's theory of defense.  After reviewing the district court's sealed order and the record pertaining to this issue, we conclude that the district court's factual findings were not clearly erroneous and that the district court did not abuse its discretion.  See United States v. Silverman, 745 F.2d 1386, 1397 (11th Cir. 1984).

*F.  Evidentiary Issues*

1.  Silver's testimony

Tokars claims that the district court erred in allowing Murray Silver to testify about Tokars's request that Silver solicit drug dealers for money laundering services and in admitting articles about money laundering authored by Tokars as extrinsic act evidence admissible under Federal Rule of Evidence 404(b).  In denying the defense motion in limine , the district court stated that the articles would be relevant to show specific intent.  After Silver's direct examination, the district court gave a limiting instruction at the request of defense counsel.

Extrinsic act evidence is admissible if the evidence is relevant to an issue other than the defendant's character and if the probative value of the evidence is not substantially outweighed by its potential to prejudice the defendant.  See United States v. Costa, 947 F.2d 919, 925 (11th Cir. 1991), cert. denied, 504 U.S. 946, 112 S. Ct. 2289, 119 L. Ed. 2d 213, and cert. denied, 506 U.S.

36

929, 113 S. Ct. 360, 121 L. Ed. 2d 272 (1992). In addition, the district court must provide a limiting instruction, as was the case here. See id. Although Tokars claims that he never denied "know how," he never entered into any written stipulation removing intent as an issue for the jury. See id. ("Because the defendants did not affirmatively take the issue of intent out of contention by stipulating that they possessed the requisite intent, the district court did not abuse its discretion in admitting evidence of unindicted extrinsic bad acts."). Based on our review of the record, we conclude that the district court did not abuse its discretion because the evidence regarding money laundering was relevant to the issue of intent and its probative value was not substantially outweighed by the risk of undue prejudice to the defendant.

2. Tax evasion

Tokars argues that the district court erred in admitting extrinsic evidence of his alleged tax evasion. Based on our review of the record, however, we conclude that the district court did not abuse its discretion in this matter. In addition, assuming arguendo that the district court erred, any error would be harmless.

3. Murder scene photograph

Tokars contends that the crime scene photograph of Sara's murder should not have been admitted because its probative value was outweighed by its prejudicial effect in violation of Federal Rule of Evidence 403. We have reviewed the photograph and conclude

37

that the photograph of the murder victim was extremely relevant to the crimes charged. Thus, this claim is meritless.

4. Homicides other than Sara

The defendants argue that evidence of the murders of Dante Snowden ("Snowden") and Ronnie Smith should not have been admitted. The district court provided a limiting instruction that the evidence was admitted for the limited purpose of explaining the Detroit Police's determination that Ferguson was a suspect in Snowden's murder. These murders were relevant to explain why Ferguson and Cline left Detroit. Tokars and Mason also object to the admission of the murders of Cline and Brown's brother Darryl Hill. The evidence concerning these murders was relevant to present a complete account of the story of the enterprise. See United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992), cert. denied, 506 U.S. 1068, 113 S. Ct. 1020, 122 L. Ed. 2d 166 (1993). Moreover, the testimony did not substantially prejudice the defendants. Accordingly, we conclude that the district court did not abuse its discretion.

5. Testimony of Agents Twibell and Davis

Tokars objects to the admission of testimony by agents Twibell and Davis regarding out-of-court statements made by Billy Carter and Greg Johnson. The government argues that Carter and Johnson's statements were admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Tokars argues that there was no existing conspiracy at the time of the statements. Co-conspirator statements are admissible so long as the conspiracy

38

existed, the declarant and the defendant were involved in the conspiracy, and the statement was made in the furtherance of the conspiracy.  United States v. Van Hemelryck, 945 F.2d 1493, 1497-98 (11th Cir. 1991).  We review the district court's factual determinations that the conspiracy existed and that the statement was made in furtherance of that conspiracy under the clearly erroneous standard.  See United States v. Allison, 908 F.2d 1531, 1533-34 (11th Cir. 1990), cert. denied, 500 U.S. 904, 111 S. Ct. 1681, 114 L. Ed. 2d 77 (1991).  Based on our review of the record, we see no error in the admission of this evidence.  Moreover, even assuming that the district court erred, any error was harmless.

6.   Birth certificates

Tokars argues that the district court re-opened the record in order to allow the government to admit birth certificates to establish the birth dates of Lawrence and Rower.  However, the government argues that the district court sustained a defense hearsay objection to admitting the birth dates through a witness and that the government requested a one-day continuance to obtain the birth certificates.  Based on our review of the record, Tokars's argument is meritless.

7.   Cobb County police records

Tokars argues that the admission through a Cobb County police officer of the contents of a sealed envelope — police reports, handwritten notes, and a business card — was error.  Our review of the record leads us to conclude that the district court committed

39

no error.  In addition, if any error was committed, such error was harmless.[16]

G.   *Jury Charge to Count V*

Tokars claims that the district court's jury charge regarding Count V, the murder-for-hire count, was modified by the court without notice, and thus created a variance from the evidence presented at trial.  Tokars contends that the parties and the court agreed to a jury instruction that would require the jury to make a unanimous finding as to each of two phone calls made in furtherance of the murder-for-hire scheme.  During the charge conference, the government consented to Tokars's requested instruction, but the court, refusing to get involved in a discussion of the evidence with the jury, concerned itself with clarifying the interstate element of the offense.  As previously mentioned, we review a district court's refusal to give a requested charge for abuse of discretion.  Maduno, 40 F.3d at 1215.  Based on our review of the record, we see no abuse of discretion concerning this issue.

H.   *Sufficiency of the Evidence*

Tokars and Mason argue that there was insufficient evidence to support their convictions and that the district court should thus have granted their motions for acquittal.  Whether there was sufficient evidence to support a conviction is a question of law subject to de novo review by this court.  Keller, 916 F.2d at 632.

---

[16]    We conclude that Tokars's argument regarding the district court's denial of his motion to suppress evidence seized from his residence is meritless in light of his voluntary consent to the search.

This court views the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor. Id. Our review of the record persuades us that there was sufficient evidence to support the convictions of Tokars and Mason. Thus, we will address only some of the defendants' contentions.

Count I charged a racketeering conspiracy involving a narcotics money laundering enterprise. Mason and Tokars claim that the evidence did not prove that there was one RICO enterprise or conspiracy, arguing that at best, the record shows the existence of two conspiracies — one involving Cline and the other involving Brown. Tokars's involvement consisted of his role in laundering cocaine money and engaging in acts of violence. Mason participated in the enterprise by laundering cocaine proceeds, distributing cocaine, and aiding and abetting violence. "Whether the evidence supports finding a single conspiracy is a question of fact for the jury." United States v. Valera, 845 F.2d 923, 928 (11th Cir. 1988), cert. denied, 490 U.S. 1046, 109 S. Ct. 1953, 104 L. Ed. 2d 422 (1989) (citation omitted). Our review of the record persuades us that a reasonable jury could conclude that one RICO conspiracy or enterprise existed.

Count VI charged Tokars, Mason, Ferguson, Hudson, and unindicted co-conspirators with a conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Tokars argues that the government's contention that his money laundering connected him to the drug conspiracy is erroneous.

41

Money launderers, however, play an integral and important role in a drug enterprise. See United States v. Perez, 922 F.2d 782, 785-86 (11th Cir.), cert. denied, 501 U.S. 1223, 111 S. Ct. 2840, 115 L. Ed. 2d 1009 (1991).[17] Our thorough review of the record persuades us that there was sufficient evidence of Tokars's and Mason's involvement in the cocaine conspiracy to support their convictions.

Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is "illegal to knowingly enter into a financial transaction involving the proceeds of a 'specified unlawful activity' with the intent to conceal or disguise the nature, location, source, ownership, or control of those proceeds." United States v. Miller, 22 F.3d 1075, 1079 (11th Cir. 1994). Mason was convicted of four substantive violations of §§ 1956(a)(1)(B)(i) and 2 as charged in Counts VIII, IX, X, and XI. Tokars was convicted of Counts X and XI. There was more than ample testimony to prove that Mason knew that the money invested in the nightclubs was drug proceeds. Thus, there was sufficient evidence regarding Counts VIII, IX, and X. Likewise, we conclude there was sufficient evidence of Tokars's knowledge of and involvement in the money laundering activities. Count XI involved Brown's purchase of a Lexus for his partner, Mason.[18] Tokars's culpability was premised

---

[17] In addition, by testifying, Tokars bolstered the government's case because the jury was entitled to disbelieve his testimony. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 909, 133 L. Ed. 2d 841 (1996).

[18] Mason contends that a prejudicial variance occurred because the indictment indicated that the transaction transpired in December of 1991 but testimony at trial indicated purchases before

on a Pinkerton[19] theory.  Mason's culpability was premised on his aiding and abetting Brown in the laundering of cocaine proceeds. We are persuaded that the evidence is sufficient to sustain the money laundering convictions.

Count XIII charged the defendants with conspiracy to launder money in violation of 18 U.S.C. § 1956(g).  Mason argues that there was no money laundering conspiracy.  He also claims that even assuming that there was a conspiracy, there were multiple conspiracies, or if there was only one conspiracy, that he was not a member.  Tokars claims that the evidence must show that the conspiracy commenced after October 28, 1992, in order to avoid an ex post facto problem and that the pled overt acts are insufficient to prove a conspiracy.  Our review of the record persuades us that there was sufficient evidence to support these convictions.

Tokars argues that the superseding indictment changed the charged offenses of murder in Count III to those of kidnaping, but that, despite this redaction, the government focused on the offense of murder, disregarding that the offense to be proved was kidnaping.  Further, Tokars contends that the government failed to prove that Tokars had any involvement in kidnaping Sara.  Despite Tokars's protestations, Sara's kidnaping was a reasonably foreseeable consequence of placing a contract "hit" on Sara's life. Tokars and Lawrence were co-conspirators in a cocaine conspiracy;

and after December.  However, Mason fails to explain how this prejudices him.  Accordingly, we see no error.

[19]    Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

therefore, it was reasonably foreseeable that originally unintended acts of violence might occur.  See  United States v. Broadwell, 870 F.2d 594, 603-04 (11th Cir.) (kidnaping reasonably foreseeable in a drug conspiracy), cert. denied, 493 U.S. 840, 110 S. Ct. 125, 107 L. Ed. 2d 85 (1989);  United States v. Alvarez, 755 F.2d 830, 847-49 & n.21 (11th Cir.) (murder reasonably foreseeable in a drug conspiracy), cert. denied, 474 U.S. 905, 106 S. Ct. 274, 88 L. Ed. 2d 235 (1985), and cert. denied, 482 U.S. 908, 107 S. Ct. 2489, 96 L. Ed. 2d 380 (1987).  Based on our review of the record, we conclude that there was sufficient evidence to support the conviction on this count.[20]

I.   *Jury Finding on Racketeering Act Nine*

Tokars claims that the district court erred by allowing the jury to find that he committed Racketeering Act Nine (Count XI), under the vicarious co-conspirator liability theory of Pinkerton. Tokars essentially argues that one must actually and not derivatively possess the requisite specific intent to commit an underlying predicate act in a RICO prosecution in order for that predicate act to qualify as an "act of racketeering" for purposes of 18 U.S.C. § 1961(5).  However, we need not reach the merits of this argument.  Any error would be harmless, because the jury specifically found that Tokars committed three other racketeering acts that constituted a pattern of racketeering activity.  Thus,

---

[20]   Mason also argues that the court erred in denying his motion for a new trial based on insufficiency of the evidence. However, based upon the above discussion, Mason's argument is meritless.

44

the two racketeering acts necessary to support the RICO conviction still remained.  See 18 U.S.C. § 1961(5).

*J.    Limitation of Cross-Examination of Ambrusko*

During the cross-examination of Ambrusko, Tokars attempted to show Ambrusko's bias on her part by questioning her about evidence of her bad relationship with Tokars.  The district court granted the government's motion in limine precluding Tokars from examining Ambrusko regarding certain evidence.  The government contends that the district court did not err in excluding the evidence because it was impermissible bad character evidence which did not impeach the credibility of the witness.  Because Ambrusko's bias against Tokars was sufficiently established,[21] we hold that the district court did not abuse its discretion in limiting the scope of cross-examination.   In addition, assuming that the district court erroneously excluded such evidence, any error was harmless.

*K.    Prosecutorial Misconduct*

Mason alleges that the court erred in denying his motions for a mistrial based on prosecutorial misconduct.  During opening statements the government suggested that the phrase "wolves in sheep's clothing," R57-621-22, would play a role in the case because the jury would be called upon to determine if the defendants were wolves in sheep's clothing or merely sheep.   In addition, the government used very vivid language to describe the

---

[21]    Ambrusko admitted during cross-examination that she and Tokars did not share a good relationship.  She also revealed that she did not implicate Tokars until five days after her initial interview with the police, and she admitted that she had been contacted by the media and had been approached about a book deal.

45

torture of Michael Jones, relaying that Ferguson treated Jones "like a piece of meat." R57-634. Tokars and Mason also allege that prosecutorial misconduct occurred during closing argument when the government appealed to the conscience of the community and made religious references.[22] Although the prosecutors may have gone a bit overboard by bringing in two of the Ten Commandments and the public policy against drugs, in light of the monumental evidence against Tokars and Mason, we conclude that the prosecutor's remarks did not prejudice the substantial rights of the defendants. See United States v. Blakey, 14 F.3d 1557, 1560 (11th Cir. 1994).

*L.   Jury Charges — Tokars's Theory of the Case*

Tokars contends that the district court erred in refusing to give his "theory of the case" charges and in giving a willful blindness instruction.[23] The court originally rejected all of

---

[22]   The objectionable portion of the closing argument reads as follows:

> He is a wolf in sheep's clothing, and you know it. And so is James Mason. Wolves in sheep's clothing, they were masquerading and parading in our society as pillars of the community, and this is why we have so many problems in dealing with drugs. This is why we cannot educate our children to have respect when members of the community who are pillars are aiding and abetting the sales of this product that is destroying our communities whether they are in public housing or whether they are in upscale neighborhoods.
> He has violated laws of ages. Thou shalt not covet. Thou shalt not kill.
> He has violated the law of the United States. James Mason has violated the law of the United States.

R76-5375.

[23]   Tokars's requested charges included: (1) a charge regarding IRS form 8300, a statement of law regarding disclosure of "Foreign Accounts" on a 1040 tax return, and a charge that routine

Tokars's so-called theory-of-the-case charges because they were argumentative of the evidence. Upon reconsideration, the court decided to give its own version of the first charge regarding foreign accounts information on an IRS 1040 tax return. Our review of the record persuades us that the district court did not abuse its discretion.

Tokars also argues that the district court erred in giving the willful blindness charge. Even if there is no evidence of deliberate ignorance, reversal is not required if there is overwhelming evidence of actual knowledge. See United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993), cert. denied, ___ U.S. ___, 115 S. Ct. 111, 130 L. Ed. 2d 58 (1994). Our review of the record convinces us that there was overwhelming evidence that Tokars had actual knowledge. Therefore, we see no abuse of discretion.

*M.   Due Process and Comments on Dismissed Charges*

Tokars contends that the district court erred in refusing to give his requested charge informing the jury that Counts VIII and IX of the indictment had been dismissed and in refusing his request that the court tell the jury what specific evidence pertaining to these two counts should not be held against Tokars. The district court refused to give the charges and instructed Tokars's counsel not to mention the dismissed counts to the jury. However, the

---

legal service does not constitute directing the affairs of an enterprise; (2) a charge relating to the Canons of Ethics requiring an attorney to represent his client zealously; and (3) a charge regarding the disclosure obligation with respect to foreign investments on a 1040 tax return.

district court provided the jury with a redacted indictment. The district court correctly concluded that even if the counts were dismissed, the jury could still consider evidence of those crimes as evidence of the existence of the enterprise. See <u>United States v. Weiner</u>, 3 F.3d 17, 22 (1st Cir. 1993) (evidence of dismissed charges relevant to remaining RICO charges against defendant); <u>United States v. Gonzalez</u>, 921 F.2d 1530, 1546-47 (11th Cir.) (testimony regarding uncharged acts permissible to establish continuity of RICO entity), <u>cert. denied</u>, 502 U.S. 860, 112 S. Ct. 178, 116 L. Ed. 2d 140, <u>and cert. denied</u>, 502 U.S. 827, 112 S. Ct. 96, 116 L. Ed. 2d 68 (1991). Accordingly, there was no abuse of discretion.

*N.   Mason's Sentence*

Mason argues that the district court erred in calculating his base offense level by converting the $160,000 laundered into a quantity of cocaine. The government argues that note 12 to U.S.S.G. § 2D1.1 allows a court making a drug approximation to consider the price generally obtained for the drug.

Application note 12 to U.S.S.G. § 2D1.1 states: "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance . . . ." Several other circuits have approved the procedure of converting cash to the amount of cocaine necessary to generate that amount of money. See <u>United States v. Ferguson</u>,

48

35 F.3d 327, 333 (7th Cir. 1994) (no error in estimating the amount of cocaine needed to generate the amount of cash laundered), cert. denied, ___ U.S. ___, 115 S.Ct. 1832, 131 L. Ed. 2d 752 (1995); United States v. Rios, 22 F.3d 1024, 1027-28 (10th Cir. 1994) (when cash seized and either no drug is seized or the amount seized does not reflect the scale of the offense, conversion of cash to quantity of drugs appropriate so long as cash is attributable to drug sales that are a part of same course of conduct or common scheme of conviction); United States v. Rivera, 6 F.3d 431, 446 (7th Cir. 1993) (approving conversion of seized currency to cocaine equivalent as long as there is proof of the connection between the money seized and the drug-related activity), cert. denied, ___ U.S. ___, 114 S.Ct. 1098, 127 L. Ed. 2d 411 (1994); United States v. Jackson, 3 F.3d 506, 511 (1st Cir. 1993) (same); United States v. Hicks, 948 F.2d 877, 882 (4th Cir. 1991) (same); United States v. Stephenson, 924 F.2d 753, 764-65 (8th Cir.) (converting seized cash to equivalent drug amount), cert. denied, 502 U.S. 813, 112 S. Ct. 63, 116 L. Ed. 2d 39, and cert. denied, 502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991). But see United States v. Gonzalez-Sanchez, 953 F.2d 1184, 1187 (9th Cir. 1992) (conversion improper where no factual finding that money was connected to the drug business). We are persuaded by our sister circuits that hold that money attributable to the drug transactions may be converted to the equivalent amount of drugs for purposes of determining the drug quantity.

Mason expresses the concern that in most cases there is corroborative evidence of the amount of drugs involved, which he claims was not available in this case. Admittedly, only one of the above cases addresses a money laundering situation. However, the evidence here clearly showed that Mason was involved in laundering drug money. Consequently, it was reasonable for the district court to convert the laundered money to an equivalent amount of cocaine. We review the district court's factual determination regarding the quantity of drugs used to establish a base offense level for clear error. United States v. Taffe, 36 F.3d at 1050. We conclude that the district court did not clearly err. Furthermore, the district court was extremely cautious and found a higher conversion figure of $25,000 a fairer standard than the $20,000 conversion figure suggested in the presentence report.

Mason also complains that the district court failed to make the necessary factual findings to support the quantity of cocaine attributed to him as required by United States v. Ismond, 993 F.2d 1498 (11th Cir. 1993). However, Ismond is not applicable to this case, because it dealt with the determination of a defendant's liability for the acts of others. Mason was held accountable only for cocaine money attributable to him. Nevertheless, even if Ismond did control, we hold that the district court made sufficient factual findings regarding the extent of Mason's involvement to support its calculation of the quantity of drugs involved.

Finally, Mason argues that the district court should have sentenced him for Count VI and Racketeering Act Two using U.S.S.G.

50

§ 2S1.1 (laundering of monetary instruments) instead of U.S.S.G. § 2D1.1 (drug offenses). Mason contends that since no guideline has been expressly promulgated for defendants convicted of a drug conspiracy based solely on money laundering activity, he should have been sentenced under the most analogous offense guideline. However, there is a guideline expressly promulgated on this issue. Mason was convicted of conspiring to violate 21 U.S.C. § 841. Section 1B1.2(a) directs a district court that is deciding the applicable guideline to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction." Application Note 1 to § 1B1.2 refers to the Statutory Index, and the Statutory Index for 21 U.S.C. § 846 refers to, among other sections, U.S.S.G. § 2D1.1. Section 2D1.1 itself contains the word "conspiracy" in its heading. The district court thus did not err in applying § 2D1.1 when sentencing Mason.

## V. CONCLUSION

All of the issues presented in this appeal are without merit. The defendants received a fundamentally fair trial which is all the Constitution requires. Accordingly, we affirm the defendants' convictions and Mason's sentence in all respects.

AFFIRMED.

51